# EXHIBIT 1

**Proposed Second Amended Complaint**

**with SAC Exhibits A through E**

**(LR 15-1(a))**

**DeCastro v. Clark County, No. 2:25-cv-00899-APG-BNW**

Jose M. DeCastro
5350 Wilshire Blvd
PO Box 36143
Los Angeles, CA 90036
(310) 963-2445
Email: chille@situationcreator.com
Plaintiff, Pro Se

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

JOSE M. DECASTRO,
Plaintiff,
vs.
CLARK COUNTY, NEVADA; ANN E. ZIMMERMAN; MICHELLE LEAVITT; BRANDEN BOURQUE; JOHN DOE BAILIFF; and JOHN DOES 1-10,
Defendants.

Case No. 2:25-cv-00899-APG-BNW

**[PROPOSED] SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983) AND DEMAND FOR JURY TRIAL**

Plaintiff Jose M. DeCastro, appearing pro se, alleges as follows. Allegations about Plaintiff's own acts and observations are made on personal knowledge. Allegations about the acts of others are made on information and belief, including information from the witnesses identified below and from the certified court records attached as exhibits.

## I. NATURE OF THE ACTION

1. This is a civil rights action under 42 U.S.C. § 1983. It arises from events at the Clark County Regional Justice Center, 200 Lewis Avenue, Las Vegas, Nevada, in March and April 2024. On March 19, 2024, before his misdemeanor bench trial began, Plaintiff, a journalist known for recording and publishing videos of police and courts, was singled out from everyone in the courtroom and compelled, by an order directed at him by name, to empty his pockets, including his suit jacket and pants pockets, and to surrender his phones, although he had already passed the building's security screening. The presiding judge then sentenced him to 180 days in custody, more than the State asked for, after remarking that his conduct "helps his You Tube channel." On April 1, 2024, a bailiff turned Plaintiff's supporters away from his public bail-pending-appeal hearing by telling them, before the

courtroom had opened, that the hearing was over. On April 9, 2024, the district court denied Plaintiff's motion for release pending appeal and vacated the hearing that had been set on it, so that no hearing on his liberty was ever held in that court.

2. On July 19, 2024, Plaintiff's convictions were reversed because his conduct was protected by the First Amendment. Plaintiff seeks damages, declaratory relief, and prospective injunctive relief against Clark County's policies and customs governing its courthouse bailiffs and marshals. Plaintiff acknowledges the binding authority on judicial immunity, and he pleads his claims arising from the sentence and from the cancellation of his district-court bail hearing to preserve them for review.

**II. JURISDICTION AND VENUE**

3. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4). Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202.

4. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Clark County, Nevada.

5. This action is timely. Plaintiff filed it on May 21, 2025, within two years of March 19, April 1, and April 9, 2024. See NRS 11.190(4)(e). The claims in this pleading arise out of the conduct, transactions, and occurrences set out in the original complaint and the First Amended Complaint, and they relate back under Federal Rule of Civil Procedure 15(c)(1)(B). See Mayle v. Felix, 545 U.S. 644, 664 (2005). Count VII did not accrue until the convictions were reversed on July 19, 2024, see McDonough v. Smith, 588 U.S. 109 (2019), and it relates back to Count VII of the First Amended Complaint (ECF No. 7). Adding or substituting a party raises separate questions. The original complaint named John Doe defendants and described their conduct, and Plaintiff will seek to substitute their true names promptly upon learning them, relying on Rule 15(c)(1)(A) and Nevada's fictitious-defendant practice. NRCP 10(d); Nurenberger Hercules-Werke GmbH v. Virostek, 107 Nev. 873, 881, 822 P.2d 1100, 1106 (1991); see Butler v. Nat'l Cmty. Renaissance of Cal., 766 F.3d 1191, 1199-1201 (9th Cir. 2014).

6. No claim in this pleading would imply the invalidity of an outstanding conviction or sentence. The conviction in State of Nevada v. DeCastro, Las Vegas Justice Court Case No. 23CR013015, was reversed by the Eighth Judicial District Court in Case No. C-24-381730-A by Order Granting Appeal filed July 19, 2024. (SAC Ex. D.)

**III. PARTIES**

7. Plaintiff JOSE M. DECASTRO resides in Los Angeles, California. He is an independent journalist and publisher who records and publishes videos of police officers and court proceedings on his YouTube channel, Delete Lawz, which has hundreds of thousands of subscribers.

8. Defendant CLARK COUNTY, NEVADA ("Clark County" or "the County") is a political subdivision of the State of Nevada and a "person" subject to suit under 42 U.S.C. § 1983 for its own policies and customs. On information and belief, Clark County recruits, hires, pays, equips, trains, supervises, and disciplines the bailiffs and marshals who provide security and control public access at the Regional Justice Center, including the bailiffs assigned to the Las Vegas Justice Court.

9. Defendant ANN E. ZIMMERMAN was at all relevant times a Justice of the Peace of the Las Vegas Township Justice Court, Department 8. She is sued in her individual capacity.

10. Defendant MICHELLE LEAVITT was at all relevant times a District Judge of the Eighth Judicial District Court, Department XII. She is sued in her official capacity for declaratory relief and in her individual capacity.

11. Defendant BRANDEN BOURQUE is, on information and belief, a police officer employed by the Las Vegas Metropolitan Police Department ("LVMPD"). He is sued in his individual capacity.

12. Defendant JOHN DOE BAILIFF is the bailiff or marshal who, on March 19, 2024, in Las Vegas Justice Court Department 8, took Plaintiff's phones and, carrying out Defendant Zimmerman's order, compelled Plaintiff to empty his suit jacket and pants pockets in open court. He is sued in his individual capacity.

13. Defendants JOHN DOES 1-10 are sued in their individual capacities. Their true names are unknown to Plaintiff, who has sought their identities diligently (ECF No. 13). The Court deferred their identification to discovery (ECF No. 14), which was later stayed (ECF No. 30). Plaintiff will seek leave to substitute their names when they are learned, for example from courtroom security logs, bailiff and marshal assignment schedules, incident reports, and personnel records. They are: (a) John Does 1-3, the bailiffs or marshals assigned to Department 8 on March 19, 2024, who before court was called confronted Plaintiff in the gallery, spoke with Defendant Zimmerman about him, and participated in the search described below; (b) John Does 4-6, the bailiffs, marshals, or courthouse security employees who on April 1, 2024, outside the Department 8 courtroom, told Plaintiff's supporters that the hearing was over and that they were not letting anybody in; (c) John Does 7-8, the supervising marshals or other County or court officials with authority over bailiff and marshal operations at the Regional Justice Center who directed, approved, or ratified the conduct described in this pleading, or who were responsible for training and supervising John Does 1-6 and John Doe Bailiff; and (d) John Does 9-10, other persons acting under color of state law who participated in the search of March 19, 2024, or the exclusion of April 1, 2024.

14. Each individual Defendant acted under color of state law at all relevant times.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's journalism and the underlying prosecution

15. Plaintiff records police officers performing their duties in public and publishes the recordings with commentary. He also records and reports on court proceedings involving police accountability.

16. On March 15, 2023, while Plaintiff was recording a traffic stop in a commercial parking lot at 4155 South Grand Canyon Drive, Las Vegas, Defendant Bourque detained and arrested him. Plaintiff was charged in Las Vegas Justice Court Case No. 23CR013015 with obstructing a public officer (NRS 197.190) and resisting a public officer (NRS 199.280). The case was assigned to Department 8, Defendant Zimmerman.

17. At the March 19, 2024 bench trial, Defendant Bourque claimed that Plaintiff did not back up. The district court on appeal later found that Plaintiff "did in fact back up when ordered to do so," that after being ordered to stop speaking to the driver Plaintiff complied, that Bourque was not hindered in his ability to issue the driver a citation, and that none of the criteria for obstruction were met. (SAC Ex. D at 4:14-15, 4:20-21, 5:1-2, 5:14-15.)

**B. March 19, 2024: the bailiffs' confrontation with Plaintiff before court**

18. On the morning of March 19, 2024, Plaintiff entered the Regional Justice Center through the public entrance and passed through the building's security screening without incident.

19. Before Defendant Zimmerman took the bench, Plaintiff was seated in the public gallery of the Department 8 courtroom, talking with supporters seated behind him. Court was not in session.

20. One or more courtroom bailiffs (John Does 1-3) came to Plaintiff and directed him to turn around and face forward. Plaintiff refused, told them he was talking with the people behind him, and responded to them in coarse and profane language.

21. Plaintiff's words to the bailiffs were speech protected by the First Amendment. They were not a threat, were not spoken while court was in session, and did not disrupt any proceeding.

22. On information and belief, after the exchange and before Defendant Zimmerman took the bench, the bailiffs spoke with Defendant Zimmerman about Plaintiff, outside the presence of Plaintiff and his counsel.

**C. March 19, 2024: the targeted search and seizure**

23. When Defendant Zimmerman took the bench and called the case, the first thing she did, before any trial proceedings, was address Plaintiff and his phones. According to the certified Reporter's Transcript (SAC Ex. A, "RT 3/19/24"), she said: "So I have signed two media requests that permit recording or photographing these proceedings. I have not granted any other request to record or live stream these proceedings. So I need Mr. Decastro and everybody else who wants to stay in the courtroom to surrender their phones or you can

leave. I need Mr. Decastro to empty all of his pockets." (RT 3/19/24 at 3:14-20.) Transcripts are cited by their own page and line numbers. SAC Exhibits A and B reproduce them four transcript pages to a sheet.

24. A marshal then told Plaintiff: "Empty your pockets and give up your phones." (Id. at 3:23-24.) When Plaintiff asked whether his phones had to be completely off, Defendant Zimmerman answered: "Yep. I don't really want to be part of your You Tube channel." (Id. at 4:3-6.)

25. Plaintiff said he would not give his phones "to this guy," and Defendant Zimmerman responded, "No. They're going to go to my marshall." Plaintiff then said of the marshal, "He's a pig." (Id. at 4:11-17.) Defendant Zimmerman warned Plaintiff that she would hold him in contempt, and Plaintiff apologized to the Court. (Id. at 4:18-23.)

26. Plaintiff told Defendant Zimmerman: "Actually Your Honor, when you weren't here he came over and gave me a directive for no reason and start telling me what to do." Defendant Zimmerman responded: "No. It is their job to maintain the safety and security of the courtroom." (Id. at 5:1-9.)

27. Defendant Zimmerman then ordered: "So I need you to empty your pockets too. Suit pocket. Pants pocket." Plaintiff objected: "This is illegal. This is a violation of my Fourth Amendment." Defendant Zimmerman responded, "No, it isn't." (Id. at 5:17-21.) Plaintiff then said, "Your guy took my phone." (Id. at 6:11.)

28. Under Defendant Zimmerman's order, directed at Plaintiff by name, John Doe Bailiff required Plaintiff to empty his suit jacket and pants pockets and took his phones, in open court in front of the gallery. Plaintiff complied only under protest and under compulsion of the order.

29. Plaintiff did not consent. He objected on the record that the order was "illegal" and "a violation of my Fourth Amendment" (RT 3/19/24 at 5:19-20), and he complied only because a judge had ordered it with armed marshals present.

30. The order to empty all of his pockets was directed at Plaintiff alone and by name, and it was given before Plaintiff made the "pig" remark. (RT 3/19/24 at 3:19-20; 4:15.) No

other member of the gallery was required to empty his or her pockets. Others were told only to surrender their phones or leave. Defendant Zimmerman told Plaintiff's counsel only to turn his phone off, saying: "No, I'm not going to take your lawyer's phone. He's an officer of the court." (Id. at 6:7, 6:14-15.)

31. When the order was given, Plaintiff had already passed the building's security screening; he was not in custody; court had not begun hearing evidence; Plaintiff had already been told to surrender his phones; there was no warrant; and no one identified any weapon or any specific safety concern about anything Plaintiff carried. Compelling Plaintiff to empty his pockets was not needed to enforce the rule against unauthorized recording, which every other person present could satisfy simply by surrendering a phone or leaving, and which Plaintiff's counsel satisfied by turning his phone off.

32. On information and belief, Defendant Zimmerman's order compelling Plaintiff to empty his pockets, and John Doe Bailiff's and John Does 1-3's execution of it, were caused by the bailiffs' report to her about Plaintiff's words to them and by Plaintiff's work as a journalist who publishes videos critical of police and courts, as reflected in her statement, "I don't really want to be part of your You Tube channel." The order was not a ruling in the case and did not resolve any issue between the parties.

33. On information and belief, the decision to subject Plaintiff to a second, targeted search was made, at least in part, before Defendant Zimmerman took the bench, during the bailiffs' communication with her described in ¶ 22, as a courthouse security measure rather than as a ruling made in the course of adjudicating the case.

34. The search humiliated Plaintiff in front of the gallery and his supporters, invaded his privacy and his possessory interests in his person, clothing, and phones, and chilled his newsgathering and speech.

**D. The sentence**

35. Defendant Zimmerman found Plaintiff guilty of both counts. The State asked that Plaintiff complete an impulse control class, pay a $500 fine or perform the equivalent

community service, stay out of trouble, and receive a 90-day suspended sentence on each count, to run concurrently. (RT 3/19/24 at 61:24-62:6.)

36. Before imposing sentence, Defendant Zimmerman stated that Plaintiff "wants to get arrested. He wants to get into an altercation with the police officers. He welcomes this. This helps his You Tube channel. He called the officers here in my courtroom today pigs." When Plaintiff responded, "I agree," she added: "So apparently he hates every law enforcement officer in the United States." (Id. at 62:20-63:5.)

37. Defendant Zimmerman then sentenced Plaintiff to 90 days in the Clark County Detention Center on each count, to run consecutively, "for a total of 180 days in custody," and when Plaintiff asked whether the sentence was suspended, she said: "Oh, no. It's going to start right now." (Id. at 63:15-23.)

38. Plaintiff has reviewed the Las Vegas Justice Court registers of action for fourteen cases from 2018 to 2024 in which Defendant Zimmerman was the judicial officer of record on a charge under NRS 197.190. In none of those fourteen cases was the defendant sentenced to jail. The obstruction charge was dismissed in eleven of them, denied by the District Attorney in one, resolved by a not-guilty disposition later amended to "Dismissed" in one, and resolved in one by deferred adjudication conditioned on an impulse-control class, after which the charge was dismissed. On information and belief, Plaintiff's case is the only NRS 197.190 case before Defendant Zimmerman in that period that resulted in a jail sentence.

39. Plaintiff acknowledges that the comparator cases did not go to a guilty verdict. He pleads them as circumstantial evidence of disparate treatment and retaliatory motive, together with Defendant Zimmerman's statements quoted above.

**E. Bail pending appeal**

40. Plaintiff appealed his convictions to the district court. On March 28, 2024, the district court, Department XII, Defendant Leavitt, set the appeal for hearing on July 10, 2024. (SAC Ex. E (excerpts).)

41. Plaintiff moved the Justice Court for bail or own-recognizance release pending appeal. Defendant Zimmerman heard and denied that motion on April 1, 2024. (SAC Ex. B, Reporter's Transcript of April 1, 2024 ("RT 4/1/24"), at 7:16-8:12.)

42. At the April 1, 2024 hearing, Plaintiff's counsel told the court that Plaintiff had "a whole bunch of people . . . wanted to come to court." (RT 4/1/24 at 3:22-23.) In denying bail, Defendant Zimmerman asked counsel, "Have you watched the videos that have been posted since he has been incarcerated?" and referred to what Plaintiff was "publishing online." (Id. at 7:16-18, 7:21-8:12.)

43. On April 4, 2024, Plaintiff's appellate counsel, Christopher R. Oram, filed in the district court a Motion for Bail, or in the Alternative, for Own Recognizance Release, captioned "HEARING REQUESTED," seeking Plaintiff's release from custody while his appeal proceeded. The same day, the clerk set the motion for hearing on April 10, 2024, at 9:00 a.m., in Courtroom 14D of the Regional Justice Center. (SAC Ex. E (excerpts).)

44. On April 9, 2024, at 12:29 p.m., the day before the hearing, Defendant Leavitt entered a minute order in chambers stating: "The court having reviewed the Motion for Bail or in the Alternative for Own Recognizance Release, does hereby deny Apellants request for bail. The hearing scheduled for April 10, 2024 is vacated." (SAC Ex. C.) No hearing on bail pending appeal was ever held in the district court. The court reviewed counsel's written motion, but Plaintiff was given no opportunity to appear, personally or through counsel, at the hearing that had been set on it.

45. Plaintiff remained in custody after April 9, 2024, and served about four months before his release. The cancellation of the April 10 hearing took away his scheduled opportunity to seek release, in person and through counsel, months before his appeal was decided. On July 10, 2024, Defendant Leavitt heard the appeal, and on July 19, 2024, she entered an Order Granting Appeal reversing both convictions "based upon First Amendment Protected Conduct." (SAC Ex. D at 5:18-20.)

**F. April 1, 2024: the exclusion of Plaintiff's supporters**

46. The April 1, 2024 hearing was a public criminal proceeding in the Las Vegas Justice Court, Department 8, set for 8:00 a.m. (RT 4/1/24 at 2:1-2.) The certified transcript reflects no closure order and no findings supporting closure. (SAC Ex. B.) On information and belief, no order closing the courtroom was entered, announced, or posted.

47. At least five of Plaintiff's supporters came to the Regional Justice Center to attend the hearing, including attorney Michael Ehline, Steve Berg, and two persons known to Plaintiff as Sagiv and David.

48. According to supporters who were there, while they were waiting outside the Department 8 courtroom, before the courtroom had been opened to the public, a bailiff (one of John Does 4-6) came to them and told them that the hearing was over and that they were not letting anybody in. The supporters said they wanted to go in and were told they could not. Mr. Ehline has stated under oath that courthouse personnel told him the hearing was not open to the public. (ECF No. 7 at 17-18.) Plaintiff expects these witnesses to testify to these facts. Mr. Ehline's declaration gives the date as March 26, 2024. That date is mistaken. The hearing he came to attend was the April 1, 2024 bail hearing. (SAC Ex. B at 2:1-2.)

49. The statements that the hearing was over and was not open to the public were false, and no order barred the public. When it was made, the courtroom had not yet been opened to the public.

50. The supporters were not told of any courtroom capacity limit, security emergency, or judicial order requiring their exclusion. None of them was disruptive. Plaintiff is unaware of any order authorizing the exclusion.

51. As a result, the hearing on Plaintiff's liberty was conducted without the members of the public who had come to observe it, including a licensed attorney.

52. On information and belief, John Does 4-6 excluded Plaintiff's supporters on their own initiative or at the direction of John Does 7-8, and not under any judicial order.

**G. Clark County's bailiffs and marshals**

53. On information and belief, Clark County recruits Las Vegas Justice Court bailiffs through its Office of Human Resources. On information and belief, a Clark County job bulletin for the position of Bailiff, Job No. 14954, Justice Court, Las Vegas, opened July 10, 2018, states that Las Vegas Justice Court bailiffs "perform law enforcement duties in the Clark County Regional Justice Center," that the position carries a firearm and requires Nevada P.O.S.T. certification, that it is an appointed position exempt under NRS 4.353, and that background checks are conducted by Clark County and the Las Vegas Justice Court.

54. Under NRS 4.353, in a county of 700,000 or more, the justice of the peace may appoint a deputy marshal instead of a bailiff, who serves at the pleasure of the justice of the peace. NRS 4.353(1). The deputy marshal must preserve order in the court, open and close court, and perform other duties the justice of the peace requires. NRS 4.353(3). If the justices cannot agree on an appointment within 30 days, the board of county commissioners makes it. NRS 4.353(2). The board of county commissioners fixes the deputy marshal's compensation, and the County pays the salary. NRS 4.353(5). Whether these officers act for the County in a particular function is a question of state law. McMillian v. Monroe County, 520 U.S. 781, 785-86 (1997). Plaintiff acknowledges that the statute gives the justices of the peace the appointment and direction of their marshals in court, and that this Court has held that the justice courts are arms of the State. (ECF No. 38 at 7-8.) Plaintiff does not sue Clark County for any judge's order or ruling, or for any act a justice of the peace directed. His claim against the County rests on conduct no judge directed: the bailiffs' report about Plaintiff before court on March 19, 2024 (¶¶ 22, 33), and the false statements by which a bailiff turned away his supporters on April 1, 2024, without any closure order (¶¶ 48-52). It also rests on the County's own recruiting, pay, training, and supervision. (¶¶ 53, 55.)

55. On information and belief, Clark County pays the salaries and benefits of Las Vegas Justice Court bailiffs and marshals; sponsors or funds their training; provides their uniforms, equipment, and weapons; maintains their personnel records; and supervises and disciplines them, through County personnel such as John Does 7-8.

56. On information and belief, the bailiffs and marshals at the Regional Justice Center control which members of the public may enter courtrooms and conduct searches of persons in the building, and in doing so they act under written or unwritten policies, customs, and training provided by Clark County, not solely under the direction of any individual judge.

57. On information and belief, at relevant times Clark County had no adequate policy, and provided no adequate training, on (a) the constitutional limits on searching members of the public who have already passed entry screening, absent individualized suspicion; and (b) the public's right to attend criminal proceedings, including that a bailiff may not exclude members of the public from an open hearing without a judicial closure order and may not give false information that a hearing has ended.

58. The need for such training was obvious. Bailiffs and marshals control access to dozens of public courtrooms at the Regional Justice Center every court day, and members of the public, including journalists who record police and courts, regularly seek to attend criminal hearings. Within thirteen days, Plaintiff was singled out for a targeted search on March 19, 2024, and his supporters were excluded from his hearing on April 1, 2024, by County-paid bailiffs.

59. On information and belief, John Does 7-8, to the extent they are County officials with final policymaking authority over bailiff and marshal operations, learned of the March 19, 2024 search and the April 1, 2024 exclusion and approved them, and no bailiff or marshal was investigated, retrained, or disciplined.

60. Plaintiff regularly attends, records, and reports on court proceedings and intends to continue doing so, including at the Regional Justice Center. He faces a real and immediate threat that County bailiffs and marshals will again single him out for a search after screening because of his journalism, or exclude his supporters from public proceedings.

## V. CLAIMS FOR RELIEF

### COUNT I: UNREASONABLE SEARCH AND SEIZURE

**(Fourth and Fourteenth Amendments; 42 U.S.C. § 1983; against John Doe Bailiff, John Does 1-3 and 7-8, and Defendant Zimmerman in her individual capacity)**

61. Plaintiff realleges ¶¶ 1-60.

62. A court order compelling a person to empty his pockets and surrender their contents is a search of his person and effects, whether or not an officer's hands enter the pockets. Compelling Plaintiff to empty his pockets and taking his phones on March 19, 2024, were a search and seizure within the meaning of the Fourth Amendment.

63. The search was unreasonable. It was conducted without a warrant, probable cause, reasonable suspicion, consent, or any exigency, after Plaintiff had already passed the building's security screening, and it was not limited to what was needed to enforce the recording rule. It was imposed on Plaintiff alone.

64. John Doe Bailiff carried out the search and seizure. John Does 1-3 caused it by reporting Plaintiff to Defendant Zimmerman and participated in carrying it out. John Does 7-8 directed, approved, or ratified it. Plaintiff acknowledges that officers who execute a judge's facially valid order may share the judge's immunity. See Engebretson v. Mahoney, 724 F.3d 1034, 1039 (9th Cir. 2013). But John Does 1-3's report about Plaintiff and their part in deciding on the search before Defendant Zimmerman took the bench were their own acts, and if the order to search Plaintiff was not a judicial act, there is no judicial immunity for anyone to share.

65. Defendant Zimmerman directed the search. She was not adjudicating a motion or issuing a warrant; she was directing a search. Issuing a general courtroom rule, such as requiring everyone to surrender phones, is one thing. Directing a second, targeted search of one member of the public who has already passed entry screening, based on bailiffs' report about him, is a security and law-enforcement function that bailiffs and court security officers perform. It is not a function normally performed by a judge and did not resolve any issue in

the case. Judicial immunity turns on the nature of the function performed, not the identity of the actor.

66. As a direct and proximate result, Plaintiff suffered humiliation, emotional distress, invasion of privacy, loss of the use of his phones, and chilling of his newsgathering, and he is entitled to compensatory or, at minimum, nominal damages, and to punitive damages against the individual Defendants, whose conduct was willful and in reckless disregard of Plaintiff's rights.

**COUNT II: FIRST AMENDMENT RETALIATION**

**(First and Fourteenth Amendments; 42 U.S.C. § 1983; against John Doe Bailiff, John Does 1-3 and 7-8, and Defendant Zimmerman in her individual capacity)**

67. Plaintiff realleges ¶¶ 1-66.

68. Plaintiff engaged in protected activity: his journalism and his publication of videos about police and courts, and his speech to the bailiffs before court was in session. Offensive or profane words directed at officials are protected unless they fall within a recognized unprotected category.

69. Defendants subjected Plaintiff to adverse action that would chill a person of ordinary firmness from continuing that activity: a public, targeted search of his person and seizure of his phones, from which everyone else in the gallery was spared.

70. Plaintiff's protected activity was a substantial or motivating factor in that action, as shown by the sequence of events (the bailiffs' confrontation with Plaintiff, their report to the judge, and the immediate order singling him out by name); by Defendant Zimmerman's statement, "I don't really want to be part of your You Tube channel"; and by her later statements that Plaintiff "hates every law enforcement officer in the United States" and about the videos he posted and what he was "publishing online," which show what "your You Tube channel" meant to her on March 19: his message.

71. A judge may not order a search of one journalist because she expects him to gather news or record the proceedings. Defendant Zimmerman signed two media requests

permitting the trial to be recorded and singled out the one journalist whose channel she did not want to be part of. That is viewpoint discrimination.

72. As a direct and proximate result, Plaintiff suffered the injuries described in ¶ 34 and is entitled to compensatory or nominal damages and to punitive damages against the individual Defendants.

**COUNT III: DENIAL OF A PUBLIC PROCEEDING**

**(Sixth and Fourteenth Amendments; 42 U.S.C. § 1983; against John Does 4-8)**

73. Plaintiff realleges ¶¶ 1-60.

74. Plaintiff invokes the public-trial guarantee of the Sixth and Fourteenth Amendments recognized in Waller v. Georgia, 467 U.S. 39, 46-48 (1984), and Presley v. Georgia, 558 U.S. 209 (2010) (per curiam), to the extent it applies to his bail-pending-appeal hearing. The Ninth Circuit has applied the right beyond trial to sentencing, United States v. Rivera, 682 F.3d 1223 (9th Cir. 2012), and the April 1 hearing was held in the trial court, in the same prosecution, on whether Plaintiff would remain jailed under that court's judgment. Plaintiff acknowledges that the Supreme Court has described Sixth Amendment rights as "presented strictly as rights that are available in preparation for trial and at the trial itself," and has held that the Amendment "does not include any right to appeal." Martinez v. Court of Appeal, 528 U.S. 152, 160 (2000). He independently invokes the Due Process Clause of the Fourteenth Amendment. A proceeding may be closed only on findings by the court that closure is necessary to protect an overriding interest, that it is no broader than necessary, and that reasonable alternatives were considered.

75. Without any judicial closure order or findings, John Does 4-6 excluded at least five members of the public, who had arrived before the courtroom opened and asked to go in, from the April 1, 2024 hearing on Plaintiff's liberty, by falsely telling them the hearing was over and that they were not letting anybody in, or that it was not open to the public. John Does 7-8 directed, approved, or ratified the exclusion, or failed to train and supervise John Does 4-6 despite the obvious need to do so.

76. The exclusion deprived Plaintiff of a public hearing on his own liberty, of the presence of the supporters who had come to observe it, and of the check that public scrutiny provides on the conduct of judges, prosecutors, and officers, and caused him emotional distress. Plaintiff is entitled to compensatory or nominal damages and to punitive damages against John Does 4-8.

**COUNT IV: PROCEDURAL DUE PROCESS, DENIAL OF A HEARING ON BAIL PENDING APPEAL IN THE DISTRICT COURT**

**(Fourteenth Amendment; 42 U.S.C. § 1983; against Defendant Leavitt in her official and individual capacities)**

77. Plaintiff realleges ¶¶ 1-60.

78. Nevada law, including NRS 178.488, allowed Plaintiff to seek release pending appeal, and he had a protected interest in a fair opportunity to do so. Due process requires, at a minimum, notice and a meaningful opportunity to be heard before the State continues to deprive a person of liberty. See Mathews v. Eldridge, 424 U.S. 319, 333 (1976). Plaintiff acknowledges that a benefit officials may grant or deny in their discretion is not ordinarily an entitlement, Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005), and that a procedure is not itself a protected interest, Olim v. Wakinekona, 461 U.S. 238, 250-51 (1983). His protected interest is his liberty, and the hearing was the procedure the State provided to protect it.

79. Plaintiff, through counsel, requested a hearing on his motion for release pending appeal, and the clerk set it for April 10, 2024. On April 9, 2024, the day before the hearing, Defendant Leavitt denied the motion in chambers and vacated the hearing. No hearing on bail pending appeal was ever held in the district court. Plaintiff does not allege that release was guaranteed. He alleges that vacating the scheduled hearing, as opposed to the outcome of his motion, deprived him of the opportunity to appear, personally or through counsel, and be heard on his liberty, notwithstanding the written motion already submitted, and of the chance to obtain release months earlier.

80. Plaintiff does not challenge Defendant Leavitt's later decision reversing his conviction. He seeks a declaration that denying his bail-pending-appeal motion after vacating the hearing that had been set on it, as applied to him, violated the Due Process Clause. Plaintiff acknowledges that a declaration about past conduct against a state official in her official capacity is generally unavailable, Green v. Mansour, 474 U.S. 64, 73 (1985), and pleads the official-capacity claim to preserve it. Plaintiff acknowledges that under Stump v. Sparkman, 435 U.S. 349 (1978), and Mireles v. Waco, 502 U.S. 9 (1991), ruling on a motion is ordinarily treated as a judicial act; he asserts his individual-capacity claim for damages to preserve for review his position that denying a person in custody the hearing set on his liberty is not protected by absolute immunity.

**COUNT V: RETALIATORY AND DISCRIMINATORY SENTENCE**

**(First and Fourteenth Amendments; 42 U.S.C. § 1983; against Defendant Zimmerman in her individual capacity)**

81. Plaintiff realleges ¶¶ 1-60.

82. The 180-day consecutive jail sentence was more than the State requested and harsher than the outcome in every other NRS 197.190 case before Defendant Zimmerman described above. It was imposed immediately after she remarked that Plaintiff's conduct "helps his You Tube channel," that he had called the officers in her courtroom "pigs," and that "apparently he hates every law enforcement officer in the United States." Plaintiff's protected speech and journalism were a motivating factor in the sentence, and he was treated differently from similarly situated defendants without a rational basis.

83. Plaintiff seeks damages. Plaintiff acknowledges that under Stump, Mireles, and Ashelman v. Pope, 793 F.2d 1072 (9th Cir. 1986) (en banc), imposing a sentence is ordinarily treated as a judicial act, and he asserts this claim to preserve it for review. He also pleads the sentence and the comparator cases as evidence of the motive behind the conduct challenged in Counts I and II.

**COUNT VI: MUNICIPAL LIABILITY**

**(Monell v. Department of Social Services, 436 U.S. 658 (1978); 42 U.S.C. § 1983; against Clark County)**

84. Plaintiff realleges ¶¶ 1-60.

85. Clark County is liable for the constitutional violations in Counts I, II, and III because they were caused by (a) the County's customs and practices, described in ¶¶ 53-60, of allowing County-paid bailiffs and marshals, without individualized suspicion, to single out members of the public who have passed entry screening, including journalists, for targeted searches, including by reporting them to the bench to obtain a search order, and to exclude members of the public from open criminal hearings without any judicial closure order, as described in ¶¶ 18-22, 32-33, and 46-52; (b) the County's deliberately indifferent failure to train and supervise its bailiffs and marshals on those subjects despite an obvious need, see City of Canton v. Harris, 489 U.S. 378, 388-90 & n.10 (1989); Connick v. Thompson, 563 U.S. 51, 61-62 (2011); and (c) on information and belief, approval of the March 19 and April 1, 2024 conduct by John Does 7-8 (¶ 59). Plaintiff acknowledges that NRS 4.353(1) gives the appointment of Las Vegas Justice Court deputy marshals to the justices of the peace, and that whether an official is a final policymaker for the County in a particular area depends on state law. McMillian, 520 U.S. at 785-86. He pleads ratification only as to County officials who, under County policy, supervise the conduct described in ¶¶ 22, 33, and 48-52. Clark County is not sued for any order or ruling of Judge Zimmerman or Judge Leavitt. The County's liability rests on its own customs, training, supervision, and ratification, not on respondeat superior.

86. These policies, customs, and failures were the moving force behind John Does 1-3's report about Plaintiff and their part in deciding on the March 19, 2024 search before Defendant Zimmerman took the bench, and behind the exclusion of his supporters on April 1, 2024.

87. Plaintiff is entitled to compensatory or nominal damages against Clark County and to prospective injunctive relief requiring the County to adopt, and train its bailiffs and

marshals on, constitutionally adequate policies on searches after entry screening and on public access to courtrooms.

**COUNT VII: FALSE EVIDENCE AND DENIAL OF DUE PROCESS**

**(Fourteenth Amendment; 42 U.S.C. § 1983; against Defendant Bourque)**

88. Plaintiff realleges ¶¶ 1-60.

89. Plaintiff backed up when Defendant Bourque ordered him to, and he stopped speaking to the driver when ordered. On information and belief, Defendant Bourque deliberately gave a false account of Plaintiff's conduct at the March 15, 2023 traffic stop, including that Plaintiff did not back up when ordered to, in the reports and statements used to charge and prosecute Plaintiff, knowing the account to be false. The district court on appeal found the opposite: that Plaintiff "did in fact back up when ordered to do so," that he stopped speaking to the driver when ordered, and that Bourque was not hindered. (SAC Ex. D at 4:20-21, 5:1-2, 5:14-15.) Count VII rests on Bourque's out-of-court reports and statements, not on his trial testimony. Cf. Briscoe v. LaHue, 460 U.S. 325, 345-46 (1983); Paine v. City of Lompoc, 265 F.3d 975, 981-83 (9th Cir. 2001). See Devereaux v. Abbey, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc); Spencer v. Peters, 857 F.3d 789, 798 (9th Cir. 2017).

90. That false account was used to prosecute and convict Plaintiff, and it caused his incarceration from March 19, 2024, until his release about four months later. Plaintiff is entitled to compensatory or nominal damages and to punitive damages against Defendant Bourque.

## VI. DAMAGES

91. As a direct and proximate result of Defendants' conduct, Plaintiff suffered injuries including humiliation and emotional distress; invasion of his privacy and his possessory interest in his phones; the chilling of his newsgathering and publication; the loss of a public hearing on his liberty with his supporters present; the loss of the district-court hearing set on his motion for release pending appeal; and loss of liberty.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

A. Award compensatory damages, in amounts to be proven at trial, against John Doe Bailiff, John Does 1-8, Defendant Zimmerman (Counts I, II, and V), Defendant Leavitt (Count IV, individual capacity), Defendant Bourque (Count VII), and Clark County (Count VI);

B. Award nominal damages on each count on which Plaintiff prevails but does not prove actual damages;

C. Award punitive damages against the individual Defendants, and not against Clark County;

D. Declare that the search and seizure of March 19, 2024, and the exclusion of the public on April 1, 2024, violated Plaintiff's rights; and that vacating the district-court hearing set on Plaintiff's motion for release pending appeal and denying the motion without it violated due process;

E. Enjoin Clark County, prospectively, to adopt written policies and train its bailiffs and marshals on (i) searches of persons who have passed entry screening and (ii) public access to open courtrooms, including that no member of the public may be excluded from an open proceeding absent a judicial closure order. No injunctive relief is sought against any judicial officer;

F. Award costs, and reasonable attorney's fees under 42 U.S.C. § 1988 if Plaintiff retains counsel; and

G. Grant such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Under Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

**EXHIBITS TO SECOND AMENDED COMPLAINT**

SAC Exhibit A: Certified Reporter's Transcript of Proceedings, State v. DeCastro, Las Vegas Justice Court Case No. 23CR013015, March 19, 2024 (filed April 22, 2024 in Case No. C-24-381730-A).

SAC Exhibit B: Certified Reporter's Transcript of Proceedings, State v. DeCastro, Las Vegas Justice Court Case No. 23CR013015, April 1, 2024 (filed April 22, 2024 in Case No. C-24-381730-A).

SAC Exhibit C: Court Minutes, Minute Order, DeCastro v. State, Eighth Judicial District Court Case No. C-24-381730-A (April 9, 2024).

SAC Exhibit D: Order Granting Appeal, DeCastro v. State, Eighth Judicial District Court Case No. C-24-381730-A (July 19, 2024).

SAC Exhibit E (excerpts): Order Setting Hearing on Criminal Appeal (filed March 28, 2024); first page of Motion for Bail, or in the Alternative, for Own Recognizance Release (filed April 4, 2024); and Notice of Hearing (filed April 4, 2024), DeCastro v. State, Eighth Judicial District Court Case No. C-24-381730-A.

DATED: November 16, 2026

Respectfully submitted,

Jose M. DeCastro
5350 Wilshire Blvd, PO Box 36143
Los Angeles, CA 90036
(310) 963-2445
chille@situationcreator.com
Plaintiff, Pro Se

CASE NO. **C-24-381730-A**

IN THE JUSTICE COURT OF LAS VEGAS TOWNSHIP

COUNTY OF CLARK, STATE OF NEVADA

THE STATE OF NEVADA, )
Plaintiff, )
vs. ) CASE NO. **23CR013015**
JOSE DECASTRO, )
Defendant. )
______________________________)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ANN E. ZIMMERMAN
JUSTICE OF THE PEACE
TUESDAY, MARCH 19, 2024

9:30 A.M.

APPEARANCES:

For the State: A. BOTELHO, ESQ.
B. MCKAY, ESQ.
DEPUTY DISTRICT ATTORNEYS

For the Defendant: M. MEE, ESQ.
ATTORNEY AT LAW

Reported by: CHRISTA BROKA, CCR. No. 574



INDEX


WITNESS PAGE
**BRANDON BOURQUE**
Direct Examination by Ms. Botelho 8
Cross-Examination by Mr. Mee 28

**JOSE DECASTRO**
Direct Examination by Mr. Mee 47

EXHIBITS ADMITTED
State's Exhibit 1 - 22




Electronically Filed
4/22/2024 2:59 PM
Steven D. Grierson
CLERK OF THE COURT

LAS VEGAS, CLARK COUNTY, NEVADA,
MARCH 19, 2024 AT 9:30 A.M.
P R O C E E D I N G S

THE COURT: Jose Decastro, 23CR013015.
MS. BOTELHO: Good morning, Your Honor. Agnes Botelho and Blake McKay for the record for the State.
THE COURT: Good morning.
MR. MEE: Good morning. Michael Mee on behalf of the Defendant who is present with me this morning.
THE COURT: So I have signed two media requests that permit recording or photographing these proceedings. I have not granted any other request to record or live stream these proceedings. So I need Mr. Decastro and everybody else who wants to stay in the courtroom to surrender their phones or you can leave. I need Mr. Decastro to empty all of his pockets.
THE DEFENDANT: What's that?
THE COURT: Empty your pockets.
THE MARSHALL: Empty your pockets and give up your phones.
THE DEFENDANT: I have to give you my



phones?
THE COURT: Yep.
THE DEFENDANT: My phones have to be completely off?
THE COURT: Yep. I don't really want to be part of your You Tube channel.
THE DEFENDANT: You already are.
THE COURT: Great.
THE DEFENDANT: You already are.
THE COURT: Awesome.
THE DEFENDANT: I'm not going to give them to this guy though.
THE COURT: No. They're going to go to my marshall.
THE DEFENDANT: He's a pig.
THE COURT: Excuse me?
THE DEFENDANT: I said he's a pig.
THE COURT: Okay. Sir, I'm not going to permit you to speak to anybody in my courtroom in that manner. If you don't want to apologize, I'm going to hold you in contempt.
THE DEFENDANT: I apologize to the Court, Your Honor.
THE COURT: No. You can apologize -- they've done nothing to you.

THE DEFENDANT: Actually Your Honor, when you weren't here he came over and gave me a directive for no reason and start telling me what to do.

THE COURT: Okay.

THE DEFENDANT: I have all the respect in the world for the Court. I follow the rule of law all the time.

THE COURT: No. It is their job to maintain the safety and security of the courtroom.

THE DEFENDANT: I agree with you, Your Honor.

THE COURT: So if you want to speak like that in my courtroom, I'm going to hold you in contempt. If I hold you in contempt, you're going to jail. That is not my wish. Okay?

THE DEFENDANT: Not my wish either.

THE COURT: So I need you to empty your pockets too. Suit pocket. Pants pocket.

THE DEFENDANT: This is illegal. This is a violation of my Fourth Amendment.

THE COURT: No, it isn't.

THE DEFENDANT: Yes, it is. I don't have any recording devices on me. What are you talking about?

THE COURT: What about your suit jacket?



THE DEFENDANT: I don't have anything on me. This is preposterous.

THE COURT: No, it's not.

THE DEFENDANT: It really is.

THE COURT: No, it's not.

THE DEFENDANT: Yes, it is.

THE COURT: Mr. Mee, your phone too. Off.

THE DEFENDANT: They are recording everything.

THE COURT: They have a media request.

THE DEFENDANT: Your guy took my phone. His phone is not on. You're going to take the lawyer's phone too?

THE COURT: No, I'm not going to take your lawyer's phone. He's an officer of the court. All right. Do we have everybody's phones? Are they off? All right. Good.

This is the time set for the trial of State of Nevada versus Jose Decastro, 23CR013105. Is the State ready to proceed?

MS. BOTELHO: Yes we are, Your Honor.

THE COURT: How many witnesses do you have?

MS. BOTELHO: We anticipate one.

THE COURT: Is the Defense ready to proceed?

MR. MEE: Yes, Your Honor.



THE COURT: I have your request to convert counsel to standby counsel. I am going deny that request. Either you represent him or he should have previously should have requested a Faretta canvas to represent himself. That I just consider that a delay tactic so that request is denied. Are you ready to proceed otherwise, I am assuming you are?

MR. MEE: Yes, Your Honor.

THE COURT: State please call their first witness.

MS. BOTELHO: The State calls Branden Borque.

THE COURT: Good morning.

THE MARSHALL: Please remain standing and raise your right hand to be sworn by the clerk.

THE CLERK: Do you solemnly swear to tell the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE CLERK: Please be seated. State your name for the record and spell it first and last name please.

THE WITNESS: It's Branden Borque. Branden is B-R-A-N-D-E-N. Bourque, B-O-U-R-Q-U-E.

THE COURT: Please go ahead.

MS. BOTELHO: Thank you.



DIRECT EXAMINATION

BY MS. BOTELHO:

Q. Sir, good morning.
**A. Good morning, ma'am.**
Q. Sir, how are you employed?
**A. I'm a police officer with the Las Vegas Metropolitan Police Department.**
Q. How long have you been employed with Metro?
**A. Just over eight years.**
Q. What is your like -- what's your occupation there like where are you assigned?
**A. I'm currently a field training officer at Summerlin Area Command.**
Q. Are you a patrol officer?
**A. Yes, ma'am.**
Q. That also trains newer officers?
**A. Yes.**
Q. Were you employed with Metro, I'm assuming you are because you've been employed for eight years, back on March 15th of 2023?
**A. Yes, I was.**
Q. Were you a patrol officer at that time?
**A. Yes, I was.**
Q. As a patrol do you wear a uniform?
**A. Yes, I do.**

Q. Can you describe the uniform.
A. **It would be the same uniform I'm wearing today.**
Q. For the record you are wearing a tan uniform with the logos Las Vegas Metropolitan Police Department located throughout your shirt?
A. **Yes.**
Q. As a patrol officer do you have access to or utilize a marked patrol vehicle?
A. **Yes.**
Q. Can you describe what this marked patrol vehicle looks like?
A. **It's black and white in color and it was LVMPD's logo on all sides.**
Q. Is it also equipped with lights and sirens?
A. **Yes.**
Q. So you were employed as a patrol officer back on March 15th of 2023?
A. **Yes.**
Q. At some point in time did you conduct a traffic stop while you were working in that capacity?
A. **Yes, I did.**
Q. On that date?
A. **Yes.**
Q. And was that for a vehicle bearing license plate 748 Z, like zebra, T like Tom, B like boy?



A. **Yes.**
Q. And what -- why did you stop that vehicle?
A. **I had conducted a DMV records check on that license plate and it came back expired and suspended.**
Q. Where is it that you stopped this vehicle?
A. **It was 4155 South Grand Canyon which was near Target.**
Q. Is that over on Flamingo and Grand Canyon?
A. **Yes.**
Q. And that's here in Las Vegas, Clark County, Nevada, sir?
A. **Yes.**
Q. And you indicated it was for a license plate that was expired and suspended?
A. **Yes.**
Q. When you initiated the traffic stop what did you do or how did you do that?
A. **I approached the driver. Let her know the reason for the stop and obtained her identifying information, registration and insurance.**
Q. Okay. I forgot to ask you earlier pursuant to your uniform and as a patrol officer are you equipped with a body worn camera?
A. **Yes, I am.**
Q. And do you also have a radio?



A. **Yes, I do.**
Q. Are those items both the body worn camera and the radio on your uniform today?
A. **Yes, they are.**
Q. Is that how the body worn camera and/or the radio were on your uniform back on March 15th of 2023?
A. **Yes.**
Q. To your knowledge was your body worn camera functioning at that time?
A. **Yes, it was functioning.**
Q. And so you made contact with the driver of that Hyundai?
A. **Yes, I did.**
Q. How would you characterize the nature of your encounter or the -- yeah, the nature of your encounter with that driver?
A. **She was cooperative with me. I explained the reason for the stop. She seemed confused. Not sure exactly it had how become suspended but she was friendly and cooperative.**
Q. Okay. And she identified herself?
A. **She did. She had a picture of her license on her phone.**
Q. Okay. At some point, sir, did you go back to your patrol vehicle to further your investigation?



A. **I did.**
Q. As you were -- let me ask you this: When you effectuated the traffic stop on this vehicle where did you park or stop your vehicle in relation to the Hyundai that you had stopped?
A. **I parked approximately ten, fifteen feet behind the stopped vehicle. We ended up in the parking lot.**
Q. Okay. Was the driver the sole occupant of the vehicle?
A. **Yes.**
Q. And so when you returned to your patrol vehicle to conduct your further investigation was the driver within eyesight?
A. **Yes, she was.**
Q. Is it your habit and custom and also your training to keep an individual that you are dealing with within eyesight?
A. **Yes.**
Q. And so at some point while you were still in your vehicle, your patrol vehicle, did something occur that's causing you to have to testify before Judge Zimmerman today?
A. **Yes. I had an unrelated person come over and start recording the traffic stop.**
Q. Okay. And we talked about body worn camera

previously but did you activate your body worn camera prior to the traffic stop?
A. **Yes, I did.**
Q. Just before you initiated the traffic stop?
A. **I initiated the stop and then I immediately activated the camera.**
Q. Okay. And how is it that body worn camera is activated on your uniform, sir?
A. **I have a battery pack that's on my belt in front and I press the activation button which is in front.**
Q. Okay. So it is just a tap of that activation button?
A. **It's a double tap on front, yes.**
Q. Okay. And how is it that you would stop recording?
A. **I would hold down that same power button.**
Q. Okay.
A. **Or it can be turned off there's a toggle switch on the top. It slides on and off.**
Q. Okay. Your body worn camera was running as of, you know, the stop the traffic stop?
A. **Yes.**
Q. Okay. And so you described an unrelated individual coming over to your stop?
A. **Yes.**



Q. Can you describe this individual?
A. **He was a white male adult. He was wearing a bright colored hoodie and blue jeans.**
Q. Okay. That individual do you see him here in court today?
A. **Yes.**
Q. Could you please point to him and describe something he's wearing.
A. **He's wearing a suit and blue tie.**
MS. BOTELHO: Your Honor, please let the record reflect identification of the Defendant.
THE COURT: So ordered.
BY MS. BOTELHO:
Q. And so what do you do upon seeing this individual approach the driver of the vehicle you had stopped?
A. **Initially when I saw him he was just recording, I ignored him and continued my records check. Then when he came over to the driver and started speaking with them I got out of the car, approached the driver, and told Decastro to back up.**
Q. When you first noticed -- you identified the unknown or unrelated related male subsequently; correct?
A. **Yes.**
Q. What was his name?
A. **Jose Decastro.**



Q. And that's the individual you identified here in court?
A. **Yes.**
Q. When you first laid eyes on the Defendant approximately how far away was he from the driver of the vehicle in the Hyundai?
A. **Approximately somewhere within five to ten feet.**
Q. Okay. And you indicated that he was recording?
A. **Yes.**
Q. What did you see that lead you to believe he was recording?
A. **He had his cellphone camera pointed directly at me.**
Q. So is that when upon seeing him being that close to the driver is that when you told him -- you walked up to the driver of the stopped vehicle and asked Mr. Decastro to back up?
A. **Yes. Once he started talking to the driver.**
Q. Okay. And why is it that you did that, Officer?
A. **Well, I can't have unrelated people next to my traffic stops. I don't know if he's a dangerous person, armed. He could be the boyfriend of the stopped person. It's for my safety and the safety of the person I stopped.**
Q. Because you're also in charge of the safety of



the individual that this unrelated individual's making contact with; is that fair to say?
A. **Yes.**
Q. And you saw it as an officer's safety issue as well as a safety issue for the driver?
A. **Yes.**
Q. And so when you approached -- you said he was recording, the Defendant was recording, at any time did you tell him to stop recording?
A. **No. In fact I told him he could continue recording.**
Q. He can continue to record given what?
A. **I said as long as he backed up and gave me the appropriate distance to work.**
Q. When you asked the Defendant to back up did he follow your order?
A. **No, he did not.**
Q. So what did you do next?
A. **I gave him three additional warnings to back up.**
Q. Okay. Did he obey those orders?
A. **No, he did not.**
Q. What, if anything, did you do with the driver of the stopped vehicle the Hyundai?
A. **At that point I chose to release the driver of the Hyundai and then focus my attention on Jose**

**Decastro.**
Q. Okay. For the record, Officer, at that point in time were you the only uniformed officer, the only officer present at the scene?
A. **Yes, ma'am.**
Q. So at this point you were dealing with a stopped driver as well as an unrelated individual and having to make contact -- or maintain visual of both?
A. **Yes.**
Q. And at that point the Defendant was not being cooperative?
A. **Correct, yes.**
Q. Okay. So you release the driver of the Hyundai. What do you tell that person to let her go?
A. **I just said that she was free to go.**
Q. And subsequently did you turn your attention on the Defendant?
A. **Yes.**
Q. Can you tell Judge Zimmerman the nature of your interactions with Defendant after that.
A. **I ordered Decastro to the front of my patrol vehicle pointing at it and told him he was detained.**
Q. What was the purpose of detaining him?
A. **For obstructing my initial traffic stop with the Hyundai.**



Q. And did he obey your lawful order?
A. **No, he did not.**
Q. And what happened next?
A. **He continued filming me. I continued pointing toward my patrol vehicle. Continued telling him he was detained. All the while he just continued shifting his body around recording me on the phone and refused to go to the car.**
Q. Okay. What did you do in response?
A. **I use my hand to escort him to the patrol vehicle. So I placed my hand on his shoulder and at that point he swatted my hand away.**
Q. What happened next?
A. **That's when I grabbed him by the shirt and I spun him around and we ended up at the front of my patrol vehicle. Both still standing.**
Q. At some point did you request additional units to respond to the scene?
A. **I did. That was before I grabbed him.**
Q. Okay.
A. **When I initially detained him.**
Q. Once you had him at your patrol vehicle the front the hood of your patrol vehicle what happened next?
A. **Officer Dingle another officer in the area that arrived. He came over to help me handcuff him.**



Q. And were you successful or did the Defendant cooperate in being handcuffed?
A. **He did not cooperate. I told him seven times to face my patrol vehicle. He did not listen. I told him six times to turn around. He did not listen. It wasn't until I told him that he was going to do to jail that was the consequence of not listening that allowed us to handcuff him.**
Q. After he was handcuffed -- when he was handcuffed was it just you and Officer Dingle present?
A. **Yes.**
Q. Once he was handcuffed what, if anything, happened next?
A. **He continued to argue with my partners Officer Dingle and other officers that were starting to show up. Then I focussed my role in completing the report and calling the sergeant because he requested a supervisor.**
Q. Okay. At some point was he arrested for a count of obstructing a public officer?
A. **Yes.**
Q. And also for resisting a public officer or resisting arrest?
A. **Yes.**
Q. At any point in time during your interaction with him or your continued visual interaction with other



officers did he cooperate with any of the officers present at the scene?
A. **No. He kept shifting around and normally we have people stand still in front of our car. I did hear him arguing with the other officers.**
Q. You indicated you had your body worn camera turned on at this time?
A. **Yes.**
Q. Did you have an opportunity to look at your body worn camera prior to court today?
A. **Yes, I did.**
MS. BOTELHO: We are going to be screen sharing through Zoom.
BY MS. BOTELHO:
Q. Officer, are you able to see? There's not a screen over there so I might have to bring mine over to you with the Court's permission.
THE COURT: Okay.
BY MS. BOTELHO:
Q. Okay. Officer, I'm showing you my computer screen. Is it fair to say that what's being shared on screen as well as what's showing up on my computer screen is are two files, one labelled 416B.MP4. The other one labelled 468#1.MP4?
A. **Yes.**

MS. BOTELHO: For the record, Your Honor, all body worn camera footage have been disclosed to the Defense well in advance of today's trial.
BY MS. BOTELHO:
**Q.** I am going to show you a brief snippet of the one labelled 468_#1.MP4. Do you recognize what's depicted here?
**A. Yes. This is the initial Hyundai that I had stopped.**
**Q.** Okay. Do you recognize this particular file as the body worn camera of your interaction first with the Hyundai and then with the Defendant on March 15th of 2023?
**A. Yes.**
**Q.** And does this show the time that you activated your camera?
**A. Yes.**
**Q.** Similar to what you testified to earlier?
**A. Yes.**
**Q.** You've had an opportunity to see this entire twelve and a half minute long video; is that right?
**A. Yes.**
**Q.** Does it fairly and accurately depict the traffic stop and also your interaction with the Defendant on the date and time we've been discussing?



**A. Yes.**
**Q.** At the location we've been discussing?
**A. Yes.**
MS. BOTELHO: Your Honor, I'd move to admit and subsequently publish 468_#1.MP4.
THE COURT: Defense?
MR. MEE: No objection.
THE COURT: It will be admitted and published.
MS. BOTELHO: Thank you.
(Playing video.)
BY MS. BOTELHO:
**Q.** I'm pausing at timestamp nine minutes and sixteen seconds. At this point, Officer, do you see the unrelated male that you've been talking about enter camera view?
**A. Yes, I do.**
**Q.** Could you point to where he is in the video on my screen.
**A. Yes. Right here.**
MS. BOTELHO: Let the record reflect he identified a male wearing a light-colored blue jacket towards the middle of the screen.
BY MS. BOTELHO:
**Q.** And is this the individual that you've been



talking about the Defendant here today?
**A. Yes.**
**Q.** I'll continue. Officer, at 1138 or a little bit before another officer comes on screen. Who is that?
**A. Officer Dingle.**
**Q.** Okay.
(Playing video.)
MS. BOTELHO: That concludes the twelve minute twenty-one second video marked 468_#1.MP4.
BY MS. BOTELHO:
**Q.** Officer, at some point after this interaction that we just saw did you come to realize that your body worn camera had accidently or inadvertently turned off?
**A. Yes.**
**Q.** At what point in time did it turn off?
**A. It would have turned off at the completion of the video that we just saw prior to --**
**Q.** Prior to what?
**A. Prior to the handcuffing.**
**Q.** Okay. Did you at some -- we noticed that Officer Dingle showed up to the scene though?
**A. Yes.**
**Q.** Okay. And do you know whether he had has body worn camera turned on?
**A. Yes. It was activated.**



**Q.** Okay. So what was -- what would have been missed by the inadvertent turning off of your body worn camera would have been captured on Officer Dingle's body worn camera?
**A. Yes.**
**Q.** Okay. Did I allow you to look at that video footage from Officer Dingle this morning prior to testifying here today?
**A. Yes, you did.**
**Q.** Did you have an opportunity to look at it to determine whether it was in fact the video related to this event?
**A. Yes. I looked at it and it was the video related.**
**Q.** So I'm turn your attention now to the video labelled 416B.MP4. I'm just going to --
THE COURT: Is it says 4168.
MS. BOTELHO: I think it's 416B.MP4.
THE COURT: Okay.
MS. BOTELHO: Or 8.
THE COURT: Okay.
BY MS. BOTELHO:
**Q.** And I just played the first thirteen seconds but actually I am going to fast forward. For the record the video is upside down, it recorded upside down?

**A. Yes, it did.**
THE COURT: Why would it record upside down?
THE WITNESS: Ma'am, there's a setting in the application where you can rotate it and this officer may not have checked that beforehand.
BY MS. BOTELHO:
Q. Stopping or starting at 454 timestamp on the video that we've been talking about, do you recognize what's depicted at least in this still portion?
**A. Yes. This is me and Decastro in front of my patrol vehicle.**
Q. So to your knowledge after having watched this does this fairly and accurately depict your interaction with the Defendant on March 15th of 2023 as caught on camera by Officer Dingle's body worn camera?
**A. Yes.**
MS. BOTELHO: Move to admit 416B or 8.
THE COURT: Defense?
MR. MEE: No objection.
THE COURT: Do you know if it's a B or 8 for sure?
MR. MEE: It looks like a B to me, Your Honor.
MS. BOTELHO: Thank you.
THE COURT: Two out of three, I lose. All



right. 416B.MP4 will be admitted and published.
MS. BOTELHO: I'm going start at 454. May I approach, Your Honor?
THE DEFENDANT: Can we move the water bottle so we can see it too?
THE COURT: Of course.
MS. BOTELHO: You can come up.
(Playing video.)
THE DEFENDANT: Can you tilt it? I can't see.
(Playing video.)
MS. BOTELHO: I'm to going stop it at 1135.
BY MS. BOTELHO:
Q. Officer, did the body worn camera portions that we played or that I played fairly and accurately depict your interaction with the Defendant on March 15th of 2023?
**A. Yes, it did.**
Q. Concerning -- I just want to talk a little bit about what was depicted in the video. In the video from your body worn camera it shows, you know, the state of your stop with the Hyundai driver. Do you recall that?
**A. Yes.**
Q. At some point prior to you making contact with the Defendant you noticed him kind of recording further



away from the vehicle; correct?
**A. Yes.**
Q. At that point in time you didn't have a problem with that you didn't really approach the Defendant yet; correct?
**A. Correct.**
Q. It was when he started making contact with the driver, your stopped driver, that you approached him and asked him to back up?
**A. Yes.**
Q. And at some point time in the video it's recorded you told him that he is allowed to record but he just needed to back up?
**A. Yes.**
Q. Okay. And what was the reason for you trying to maintain one, the lack no contact with the stopped person and two, trying to gain distance between the Defendant, yourself, and the stopped driver?
**A. My first intention is I wasn't trying to delay my traffic stop any longer than it had to be. I was trying to make it as short as possible for the driver. The second was for officer safety. What we're taught in the academy is that for a normal humans reaction time with open ground anything within twenty-one feet that suspect would be able to charge an officer without them being**



**able to react in time.**
Q. And that point in time you were the only officer present; correct?
**A. Yes.**
Q. Okay. And when he began -- when the Defendant failed to obey your command to back up that's when you decide to engage him?
**A. Yes.**
MS. BOTELHO: Court's indulgence. I have no more questions for this witness. Thank you.
THE COURT: Defense?

CROSS-EXAMINATION

BY MR. MEE:
Q. Good morning, Officer. How are you today?
**A. Good morning, sir. I'm well. How are you?**
Q. Very well. How many feet did you order the Defendant to back up specifically?
**A. I never had an opportunity to give him an exact distance.**
Q. How far back did you intend to have him back up if you had expressed that?
**A. In the background of the video you can see there was a parked semi-truck and light pole I would have directed him somewhere in that area which would have**

**been outside the twenty-one feet.**
Q. Your testimony is you never told him an exact distance to back up; correct?
**A. Yes. He never allowed me to.**
Q. What do you mean never allowed you to?
**A. I asked him to back up and he continued to argue with me so I can never specify the exact distance for him.**
Q. But you had time to give him five commands to back up; is that correct?
**A. Yes.**
Q. Your testimony is he never backed up when you were giving him commands; is that correct?
**A. If he backed up, it may have been inches but he didn't substantially back up.**
Q. You just reviewed the body worn camera from your chest; is that correct?
**A. Yes.**
Q. You didn't notice him backing up every time you directed him to back up?
**A. He did not back up.**
Q. So he backed up zero feet in your opinion?
**A. Not zero feet.**
Q. What was that?
**A. He didn't back up zero feet. He was moving his**



**feet. As to exactly how far he moved back I don't know but it wasn't substantial.**
Q. What would have been substantial in your opinion? What do you mean by that?
**A. I would have guided him, if he wasn't arguing with me, back towards the light pole and the parked semi-truck which would have outside of twenty-one feet. That was my goal.**
Q. So in your opinion you have the ability or you would at any traffic stop ask somebody to move back twenty-one feet; is that correct?
**A. Yes, per our training.**
Q. And what was that training?
**A. That while we're conducting lawful activity we are allowed a reasonable distance to conduct our activity.**
Q. Where did you get that twenty-one feet number from specifically?
**A. That's taught to us in the academy. It's based on reaction -- normal human reaction time to a threat.**
Q. So your is position anytime you're engaging in law enforcement activity you would create a twenty-one feet perimeter?
**A. Not necessarily. It depends on other environmental factors such as obstacles and barriers.**



Q. So your testimony is that every time you conduct a traffic stop as long as there's no barriers you would order a pedestrian to back up to twenty-one feet; is that correct?
**A. I would, yes.**
Q. What training do you have in regards to the First Amendment?
**A. Standard academy training.**
Q. Can you explain what that entails.
**A. Usually includes a classroom setting power point taught by the police officer academy officer.**
Q. Do you remember receiving that training specifically?
**A. Yes.**
Q. How long ago was that?
**A. When I was first employed about eight years ago.**
Q. Did you have any follow-up training?
**A. Specifically on First Amendment we've had some follow-up training regarding First Amendment auditors.**
Q. Okay. Can you explain what that follow-up training was.
**A. The follow-up training was to -- just a refresher on the First Amendment and how the department wants to handle or react to First Amendment auditors.**
Q. In that training did they explain any case law



governing how many feet somebody has to move back or anything like that?
MS. BOTELHO: Objection, Your Honor. At this point relevance. I think it is beyond the scope of, you know, the charges you are to determine guilt at this time.
THE COURT: Can you tell me what's the relevance?
MR. MEE: Yes, Your Honor. He detained the Defendant after issuing commands to back up a particular distance. He's testified he received training. I should be entitled to cross-examine him about what that training is and how he's coming up with the specific numbers he used.
THE COURT: I think her objection was with respect to the case law that you're inquiring about.
MR. MEE: Your Honor, our position is that he is issuing commands that are contrary to case law and he has been trained on that case law but there can't be an obstruction of justice.
THE COURT: So I'm going to sustain the objection and ask that you move along.
BY MR. MEE:
Q. Have you had any prior issues enforcing the First Amendment?

33

A. **No.**
Q. Prior to this event taking place had you heard of Jose Decastro?
A. **No.**
Q. Do you recall when you first heard about First Amendment auditors specifically?
A. **It would have been in the academy.**
Q. When you were first trained you had heard about the auditors back then?
A. **Yes. When we were learning about the First Amendment they would typically bring up issues that might be a frequently seen thing and the First Amendment auditors are typically the ones that we encounter when first when First Amendment claims against us.**
Q. Do you have any belief that First Amendment auditors are likely to be violent?
MS. BOTELHO: Objection. Relevance.
THE COURT: What's the relevance? I am only concerned with Mr. Decastro.
MR. MEE: Your Honor, one of the legal issues at question here is whether or not these commands are reasonable. I think that has to be based on his past experiences in training.
THE COURT: Sustained.
/ / /

34

BY MR. MEE:
Q. During this traffic stop in particular what specific factors lead you to believe there might be a danger to officer safety?
A. **Based on his proximity to my driver. Based on his demeanor being argumentative. Based on his physical demeanor. His veins were popping out of his neck as he was yelling at me.**
Q. You can see his veins popping out of his neck from back where your vehicle is?
A. **When I was at the driver's side window I could see that but not at my car.**
Q. When you see him walking up from your car what is your specific concern regarding officer safety at that point in time?
A. **It's my safety and the safety of the driver. I don't know who this person is. I've never met him before. He can be peaceful. He can be violent. I just don't know. There's so many unknown factors and I also have a responsibility to protect that driver. If I were in that driver's position, I wouldn't want to be approached by some random person recording me and interviewing me.**
Q. Did you ever ask the driver of their opinion about whether they wanted him there or not?

35

A. **No.**
MS. BOTELHO: Objection. Relevance.
THE COURT: Sustained.
BY MR. MEE:
Q. Was your primary concern he was speaking to the driver or him not backing up?
A. **My primary concern was safety. I don't know if he was armed or what his intention was.**
Q. Do you presume someone is armed and dangerous just because they're in public?
A. **I can't rule out that he's unarmed.**
Q. But you had no reason to believe he was armed on this particular occasion?
A. **No. Nobody had told me he was armed and I didn't see any weapons visible but he was wearing clothing that could have easily concealed weapons.**
Q. When he first came upon the scene you were in your vehicle typing on your computer; is that correct?
A. **Yes.**
Q. What were you doing in relation to that traffic stop?
A. **Conducting a background to see if her license was valid, to see if she had any criminal history to help make a decision whether to warn her or issue a citation.**
Q. You stated your belief was that the driver was entitled to privacy?

36

A. **I did say that.**
Q. What did you mean by that?
A. **Instead of continuing to give him commands to back up, I said something different to try and help him understand. She's really not entitled to privacy but she's entitled to safety.**
Q. So your explanation is that you said that because you were trying to convince him to back up not because you believed it?
A. **Yes. If I continued to give the command to back up and he's not listening, I can't expect something different to happen if I just keep saying back up.**
Q. In your police report do you recall referencing the fact that he had due notice in your opinion of what you were commanding him to do?
A. **Yes. When I gave him four commands to back up that was due notice.**
Q. You'll agree with me that he did not have notice as to the distance you wanted to him to back up; is that correct?
A. **That's correct.**
Q. Approximately how long were you issuing these commands before you decide to detain him?
A. **Approximately fifteen, twenty seconds.**

Q. And your testimony is you didn't have any time during that back and forth to tell him a specific distance to back up?
**A. Not time but no opportunity.**
Q. How so?
**A. Well, every time I tried to speak with him he would argue. He wasn't listening at all. So if he's not understanding back up, how would you explain something that was more complex?**
Q. What was preventing you from saying back up to a particular location?
**A. First I would want him to back up and if he didn't back up far enough, I would give him an exact location.**
Q. Okay. But you never did; correct?
**A. No. I never did.**
Q. Did the Defendant's verbal comments towards you influence what you decided to do that day?
**A. No.**
Q. On the video did you see that point in time when you decided to detain him was specifically after he made an insulting comment towards you?
**A. That wasn't why I choose to detain him. I realized that he wasn't going to back up at that time.**
Q. His comments didn't make you angry at him?



**A. No.**
Q. In your review of the video just now he had both hands in front of him the entire time; is that correct?
**A. No. At one point he reaches towards his back pocket to pull out his second phone.**
Q. Did you quickly see that it was a second phone he was going for?
**A. Yes.**
Q. Once you see him produce a second phone in his hands he's obviously not reaching for weapon; is that correct?
**A. At that time, no, he wasn't.**
Q. What time of day did this occur at?
**A. If I remember correctly 4:30 in the afternoon.**
Q. This was in a broad public place?
**A. Yes.**
Q. Does the fact that this occurred in broad daylight in a public influence your decision making as far as issuing commands to the Defendant?
**A. It could. In this particular case it didn't.**
Q. Why is that?
**A. There was nobody around us other than me and the driver and Decastro.**
Q. You testified he swatted your hand away; is that your testimony today?



**A. Yes, that's the best way I can describe.**
Q. You saw his arm do this or you just felt it?
**A. I saw it and felt it.**
Q. Do you recall in your police report stating that you did not believe his intent was to harm you?
**A. Yes. I wrote that.**
Q. What is your basis for reaching that conclusion?
**A. He could have been charged for a battery on a police officer which would have been more severe but I didn't think his intent was to hurt me so I didn't charge him with that.**
Q. You testified today one of the things you were concerned about was him not going over to your vehicle; is that true?
**A. Yes.**
Q. Will you agree with me that he actually did walk over to your vehicle at some point during the interaction?
**A. Yes but it wasn't reasonable the amount of time it took him.**
Q. What would be a reasonable amount of time?
**A. Asking him to step in front of my car and him doing so immediately.**
Q. How fast is immediately?
**A. This is isn't based off of time my response.**



**It's based off on the interaction. I had to tell him he was detained multiple times. I made it clear what he was detained for. I said he was detained for obstructing. I gave him several commands to step in front of my car. I would think a reasonable person would walk over to my car then we'd have a conversation there.**
Q. How specifically did his presence obstruct your ability to complete the traffic stop?
**A. Again I don't know what his intention is. I don't know if he's armed. All I saw him was him recording which again I had no issue with and I told him I didn't have an issue with. At some point in time if I were to issue a citation to the driver my focus would be on the driver and what's inside her car. At that point I hadn't pulled her out. I hadn't pat her down. I don't know if she has any weapons in the car or what her intent was if there was anything underlying. My intention on having Decastro back up was so that I didn't have split attention. It was too close for me to have split attention.**
Q. One of the things you stated you were concerned about I guess for a safety point of view was that he didn't identify himself; is that true?
**A. No, I didn't care about his identity until I had**

**him detained.**
Q. Okay. At any point during, I guess the detention of the Defendant, did you pat him down to determine he didn't have any weapons?
A. **I did.**
Q. Okay. When was that during the duration of the interaction?
A. **That was immediately after handcuffing.**
Q. Did you discover any weapons on him?
A. **No, I did not.**
Q. From your police car while he's walking up you essentially have a complete view of his movements and what he's doing at that point in time?
A. **Yes.**
Q. You never saw him during that time period before you got out of your car reach for weapons or anything like that?
A. **No.**
Q. Were there other individuals around the traffic stop other than Defendant and the driver?
A. **Not that I can remember.**
Q. Do you recall anyone walking through the scene and asking about the restaurant next door?
A. **I don't remember that.**
Q. But your testimony is if there was someone else



on video, you would have ordered that person to back up twenty-one feet?
A. **I would have first asked them to back up and most people do. If they did not comply then I would give them a specific area to back up to.**
Q. You ordered him not to speak to the driver; is that correct?
A. **Yes. Well -- I remember asking him to back up. I don't remember if I remember specifically asked him not to speak to the driver. I think I might have said don't talk to her or something to that effect.**
Q. Did he speak to her before you got out of your patrol vehicle or afterwards?
A. **Before. I saw Decastro filming. I stayed in my vehicle and continued my business. Then when I saw him speaking to the driver that's when I exited.**
Q. Did you see him speak to the driver after you exited the vehicle at any point?
A. **I don't remember if he spoke to the driver after I exited.**
Q. At any point did you hear specifically what he may have said to the driver?
A. **No. I was too far away and it was windy.**
Q. Is it your position that anytime you're engaged in a traffic stop nobody can speak to the driver?



A. **They can speak to them at a reasonable distance.**
Q. Is that the twenty-one feet?
A. **It could be. It could be shorter. It could be longer. Again it depends on the environment. The totality of the circumstances.**
Q. Do you think people can easily verbally communicate at twenty-one feet?
A. **No, not without shouting.**
Q. At some point the Defendant informed you that he was a member of the press?
A. **He did.**
Q. Did that influence any of the orders you chose to give or not give to the Defendant?
A. **No. It doesn't matter.**
Q. Why does it not matter? What is your basis of that statement, I guess?
A. **Media reporters and standard citizens I treat them all the same.**
Q. So you becoming aware that somebody is a member of the press does not affect your decision making in reference to your First Amendment training?
A. **No. And how was I to know that was a member of the press? Whenever I interact with members of the press they usually identify what station they're with or group that they're with. They usually have some sort of**



**identification badge and we have a good relationship with press out here. They don't approach us the way that Decastro did.**
Q. Are you familiar with the difference between traditional press and independent media?
A. **Yes. But again independent media would approach us more respectfully than Decastro.**
Q. Is your opinion that traditional media has different rights than new media, independent media?
MS. BOTELHO: Objection, Your Honor. At this point I think we are well beyond the scope.
THE COURT: Sustained.
MS. BOTELHO: Thank you.
MR. MEE: Court's indulgence.
BY MR. MEE:
Q. Your testimony is that, if I recall correctly, that you received First Amendment training when you initially went through your officer training?
A. **Yes.**
Q. And you received one follow-up after that?
A. **No. It was more than one. I don't know exactly how many. Typically that training is annual.**
Q. Your testimony just to reiterate this is the first time you've experienced a First Amendment issue of this nature in your career?

MS. BOTELHO: Objection. I believe I objected to that question when it was posed as a violent encounter. I also objected on the grounds of relevance. As the Court indicated what we're concerned about is his interaction with the Defendant specifically. So I object.

THE COURT: Sustained. I'm only concerned about this interaction.

BY MR. MEE:

**Q.** Do you recall during your interactions with the Defendant that you told him that you believed First Amendment auditors often pull out guns and shoot people?

**A.** **I didn't say that they often do that.**

**Q.** Do you recall what you said?

**A.** **I don't. I would have said he was a stranger to me and that officers get ambushed all the time. It could have been a First Amendment auditor. It could have been a regular citizen. It could have been a cook from one of the places nearby. I wouldn't have specifically said that First Amendment auditors are a higher risk.**

**Q.** Again just to reiterate your testimony is --

MS. BOTELHO: Objection. Anytime it's prefaced as just to reiterate, I should object on asked and answered grounds and I did not just to hear it but



just sounds like a reiteration of questions that have been previously asked. So my objection is asked and answered.

THE COURT: I am going let him ask the question before I rule on your objection.

BY MR. MEE:

**Q.** Again I am trying to clarify because I think it's ambiguous but do you recall the Defendant telling you he was a member of the press during the interaction?

MS. BOTELHO: Asked and answered.

THE COURT: Sustained.

MR. MEE: No further questions, Your Honor.

THE COURT: Any redirect?

MS. BOTELHO: No. Thank you.

THE COURT: Thank you, Officer. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Does the State rest?

MS. BOTELHO: At this point we do.

THE COURT: Does the Defense have any witnesses?

MR. MEE: Your Honor, I call Jose Decastro.

THE COURT: All right.

THE MARSHALL: Remain standing, raise your right hand, and be sworn by the clerk.



THE CLERK: Do you solemnly swear to tell the truth, the whole truth, and nothing but the truth?

THE DEFENDANT: Yes, I do.

THE CLERK: Be seated.

THE COURT: Mr. Decastro, before you testify I'm obligated to inform you that you have the right to testify in this proceeding but you also have the right to remain silent and should you choose to remain silent I may not hold that against you in making my decision. Do you understand that?

THE DEFENDANT: I do.

THE COURT: Do you still wish to testify?

THE DEFENDANT: Yes, I do.

THE COURT: All right.

DIRECT EXAMINATION

BY MR. MEE:

**Q.** You own a You Tube channel?

**A.** **Yes, I do.**

**Q.** Can give us some insight into what that channel is about?

MS. BOTELHO: Objection. Relevance.

THE COURT: What's the relevance?

MR. MEE: Your Honor, the relevance is that we're presenting a First Amendment defense. The



Defendant is a member of the press. There's different standards for First Amendment rulings where there's public policy at issue. He can give you insight into that.

THE COURT: I'm going to allow it for a bit to see where it goes.

THE DEFENDANT: Yes, I do have a -- first, I do have a You Tube channel. The reason I have a You Tube channel is because how many cops kill people every year. How many cops hurt, maim, torture, rape, and kill people every single year. It's such an epidemic that the rest of the world -- I get thousands of e-mails saying only in America does this happen. I started filming cops because when I was cheated in 2002 --

MS. BOTELHO: Objection, at this point. Relevance. Narrative.

THE COURT: So can you ask him a question?

MR. MEE: Yes, Your Honor.

BY MR. MEE:

**Q.** What type of films do you make for your You Tube channel?

**A.** **I only film police in their official capacity. I'm known across the country and across the world.**

**Q.** Why do you engage in that type of filming?

MS. BOTELHO: Relevance.

THE COURT: I am asking you, Mr. Mee, to direct the questions about the incident in question.
THE DEFENDANT: The reason I was filming --
MS. BOTELHO: Objection, Your Honor. There wasn't a question.
BY MR. MEE:
Q. Mr. Decastro, on the date in question why did you approach that vehicle?
A. **I was filming that cop because that's what I do for a living. I am a member of the press. I invoked my right to be press. I always invoke my right to be press within that first ten seconds of engaging with police and I have thousands of videos to prove this.**
THE COURT: So this is how you make money?
THE DEFENDANT: This is not how specifically I make money. I make money from selling legal documents to people.
BY MR. MEE:
Q. Do you recall the Officer telling you to back up?
A. **Yes, I do.**
Q. What did you do after he told you to back up?
A. **I took a couple steps back. I just showed him I was willing to back up a little bit, however, if I may? In Arizona --**
MS. BOTELHO: Objection. Relevance. We are



not in Arizona. It's the State of Nevada.
THE COURT: So I am going to allow it because I think that goes to why he kept saying ten feet in the video. Even though I will take judicial notice that you're not in the State of Arizona. You are in the State of Nevada.
THE DEFENDANT: A federal judge struck it down, Your Honor. And --
THE COURT: Stop. Can you ask him a question?
MR. MEE: Yes, Your Honor.
BY MR. MEE:
Q. Approximately how many feet did you back up?
A. **I backed up a foot or two. I was at least ten feet away from the car that the driver was pulled over in.**
Q. When you spoke to the driver what did you say?
A. **I asked her if she was okay. The reason I film police is because they abuse people so often.**
Q. Do you recall the Officer telling you not to speak with the driver?
A. **Yes.**
Q. Did you make any statements to the driver after this command was given?
A. **Absolutely not.**



Q. Did the Officer ever give you a specific distance to back up to?
A. **No. He didn't.**
Q. If he did, would you have complied with that?
A. **Sure.**
Q. Did you believe you were complying with the Officer's commands?
A. **100 percent. I also informed him I was a member of the press and a Constitutional law scholar this is what I do.**
Q. Do you recall the Officer explaining to you why he decided to arrest you?
A. **There's several parts to the reason why he said he was going to arrest me because I wouldn't turn my head a certain direction. If I didn't turn and face the car with my head that he'd place me under arrest instead of just giving me a ticket.**
Q. Do you recall him explaining why he decided to detain you before he arrested you?
A. **He decided to detain me because he said I was obstructing which from my understanding is a physical act where I would have to get in the way. He said that the driver deserved privacy. I believe my First Amendment rights are not up for feelings.**
Q. Did he explain to you that the basis of your



detention was related primarily to the issue of privacy or the issue you of backing up?
A. **Well, I think from the Officer's testimony we can see he's scared of the driver, scared of me, scared of everything. They teach them to be afraid of everything. So I had two cameras out, identified as a member of the press -- I'm sorry, repeat the question. I want to get it specific for the record.**
Q. Sure. The question was: Did the Officer explain to you that the basis of your detention was you not backing up or because of a privacy issue?
A. **It was both. He said that -- he told me to back up and I backed up a little bit. Then he said she deserves privacy. Then I told him to go get in your car little doggy and write your ticket. At that point his face turned beat read and his veins in his neck stuck out because we were over twenty feet away. You had to holler to hear each other because the wind was 30 miles an hour.**
Q. Did you at anytime attempt to hit any officers involved?
A. **No. Absolutely not.**
Q. Did you intentionally swat at any officers?
A. **Absolutely not. He was giving me unlawful commands. I should have not been detained after I**

**identified as a member of the press. If he ever reached a hand out towards me, I wrestle and teach MMA and I have for 30 years so it's just a natural reaction when retreating from somebody. If I may have put my hand up as he said as he testified himself, I certainly am a law abiding citizen I don't break the law. I would have not tried to assault an officer under any circumstances.**

Q. Is it possible during the interaction there was inadvertent contact?

A. **Sure. He decided to go hands on with me when he was giving me unlawful commands. There was absolutely no reason for it. I was willing to comply with anything he asked within reason because I don't want to have a fist fight with another man on the street.**

Q. Do you recall the Officer ordering you to go to his patrol vehicle?

A. **I do.**

Q. And what did you do in response to that?

A. **Initially I told him no. But then when he began to get physical with me and start to grab me and touch me, I said okay I'll go over to your car. His car was 35 feet away. I then lead him to his car. It's on video you can see it. I walked right up to his car and he insisted still on grabbing me after he saw me pull out an additional phone. Which that's what press people**



**do, we have lots of cameras on us.**

Q. Did you inform the Officer that you were a member of the press?

A. **Oh, several times. It's in the transcripts. I've transcribed them myself. Several times I told him I'm a member of the press.**

Q. Did you explain to the Officer that you have background in Constitutional law?

A. **Yes. I'm told him that I'm a Constitutional law scholar which was a monicker given to me by other people who are also -- they have their own channels their own press and that's what some other lawyers on another channel called me three years ago and I since adapted the monicker.**

Q. Just to get some further background, were you looking for police to record on this particular day?

A. **No. The cops hide on the side of the road to pull people over. It's pretty regular in our country. I was just in the parking lot there and I saw that Mr. Bourque had somebody pulled over concerned for her safety I began to film.**

Q. Why do you think law enforcement traffic stops are relevant to the public?

A. **That's where most people get killed.**

MS. BOTELHO: Objection. Relevance --



THE COURT: Sustained --

MS. BOTELHO: Move to strike.

THE COURT: Sustained.

MR. MEE: I'll pass the witness, Your Honor.

THE COURT: State?

MS. BOTELHO: I have no questions for this witness. Thank you.

THE COURT: Thank you, sir. You may step down. Does the Defense rest?

MR. MEE: Yes, Your Honor.

THE COURT: Any argument by the State?

MS. BOTELHO: Your Honor, the State asks you find the Defendant guilty of both the obstructing a public officer as well as resisting a public officer charged against him. The video very adequately portrays what the context was of the interaction with the Officer. I would venture to say had the Defendant just complied with the original order to not engage with the driver and to back up we wouldn't be here. He wouldn't have found himself further engaging Officer Bourque. This is not a First Amendment issue. As you heard over and over and over again on the video Officer Bourque did not have a problem with the Defendant recording. It's not a First Amendment issue, it's an officer safety issue. Here you have an officer who conducted a lawful



traffic stop. You saw the nature of the stop. There was no animosity between the officer and the driver. It was rather peaceful and they engaged in banter back and forth. He would have as he testified he was trying to determine whether he was going to cite her or let her go with a warning. Then you have an individual the Defendant introduce himself into the situation. Traffic stops, Your Honor, are inherently dangerous particularly in parking lots and I guess anywhere, you know, I would venture to say. This Officer was reasonable in thinking that anyone who would approach in the manner that the Defendant approached his scene would have a reason to fear for his safety or at least be suspicious of this individual's motives coming in. The Officer had no problem with him recording. The Officer had no problem with the Defendant observing. It was when he inserted himself into this lawful detention that was occurring with the Hyundai driver that the Officer turned his attention to the Defendant. This is not a First Amendment issue. This is an individual who took his what he perceived to be his rights too far. The Officer was well within his rights as well as acting reasonably when he asked him to back up. That twenty-one foot rule it's appropriate. He said that was the training that they received in terms of the distance that's allowed

for someone who means to do them harm. It's a threat assessment. We don't know when the Defendant approached whether he had a gun concealed, whether he had a knife concealed, whether he had other weapons. You'll hear multiple times in the video Officer Bourque yelling stop reaching, stop reaching. This is an unknown -- you know when Defense Counsel asked Officer Bourque all these questions about how it is that you do this and Officer Bourque had been responding it depends on the situation. It depends upon the totality of the circumstances. Here was an officer acting alone engaged one to one with a driver that he had no problem with. You insert another individual who enters the scene in the manner that the Defendant did and now this Officer's attention is going to be divided. He had every reason to fear for his safety as well as that of the driver. Again, if he had just complied with the Officer's commands or demands to back up, and you know, a lot was made about hey, he didn't have an opportunity to tell the Defendant exactly how far back. As the Officer testified even just with the hey back up the Defendant didn't back up. The Defendant didn't back up not willingly. That's why the Officer had to continue to engage with him and force him into this situation. Had he complied he would not have been charged with obstruction. He had complied



initially he would not have been charged with the resisting. Officers -- you are going to have to assess credibility. There's nothing in the video or Officer Bourque's testimony that would cause the Court to question his veracity or his intention for that matter. He was very honest in that he didn't believe that the Defendant was trying to harm him necessarily with the swat that's why the Defendant wasn't charged with a battery on a protected person or a police officer but that swat, Your Honor, I would argue was meant to resist at that point in time the Officer was trying to detain him and subsequently arrest him on the obstruction as depicted in the video. So I think at this point I think we've proved by beyond a reasonable doubt that the Defendant did hinder Officer Bourque's investigation and detention of the Hyundai driver and that he resisted the Officer's arrest or attempt to arrest him. So we would ask that you find the Defendant guilty of both charges.

THE COURT: Thank you. Defense?

MR. MEE: Yes, Your Honor. First of all, you cannot obstruct an unlawful order. I disagree with the State that is not a First Amendment issue. The First Amendment in this context actually has two parts. There's the filming and the right to film within a reasonable distance. The case law in all the federal



circuits, Your Honor, there's no twenty-one feet rule that's been approved by court of which I am aware. There is a ten-foot rule that seems to be the rule that is applied by most of the federal circuits in interpreting the First Amendment. I submitted a bench brief that kinds of goes through that issue.

THE COURT: I don't have that. When did you submit it?

MR. MEE: It was submitted yesterday, Your Honor.

MS. BOTELHO: At this point I move to strike because it's untimely. I got it this morning when I walked into court.

THE COURT: Go ahead.

MR. MEE: The Officer's testimony that there's essentially this 21-foot distance where anybody can charge an officer and cause physical harm to an officer if that is applied universally, Your Honor, it totally diminishes and violates the First Amendment. That is as the Officer testified a 21-foot radius that he can attempt to impose I believe his testimony was anytime there's not an obstacle between a person and somebody that law enforcement is interacting with. That's just not what the law requires, Your Honor. The First Amendment gives the media, new media, old media it



gives individuals the right to film government agents. There is no dispute that that's the requirement. If the Officer is applying this 21-foot circumference to all law enforcement interactions he's affectively eliminated the ability to film law enforcement going about their duties. The commands to not to talk to the driver are also not based on actual legal justification. There is no right to privacy in public. There's no requirements or no statute, no law, that citizens can't interact with drivers that are interacting with law enforcement. So what's taken place here, Your Honor, is that this Officer has taken it upon himself to essentially act as the legislature and created these rules that have no basis in any law and are in fact contrary to the First Amendment. Again, you can't obstruct an unlawful demand. There's no obstruction of justice here. Resisting arrest, Your Honor, the Court can see the video. Essentially what happened is he walked over to the front of the vehicle. There was some dispute about why he was being detained. That was discussed. The case law in that area, Your Honor, is that if it's an unlawful arrest which it was in this case because they're essentially arresting him for violating these unlawful orders that they're pronouncing. Again the case law you can passively resist an unlawful arrest.

That's all that occurred here, Your Honor. Thank you.

THE COURT: All right. Mr. Decastro, please stand. The problem with the argument that your attorney makes is it completely fails to consider the safety of the officer and the safety of the driver. The Officer doesn't know who you are and the driver doesn't know who you are. You don't have any right to interfere with that officer doing his investigation in deciding if he wants to issue a ticket to this driver. You also don't have any business approaching the driver. The driver didn't ask you for help. The driver didn't say help, help, you know? You didn't see an altercation happening between the Officer and this driver. The Officer didn't protest that you were filming. There's no problem with filming. You can film. It's fine. All right? But you did interfere with his investigation. You did interfere with his ability to do his job. You did put him in a position where he is concerned for his safety and the safety of the driver. So I believe the State has met their burden beyond a reasonable doubt. I'm going to find you guilty of obstructing a public officer and resisting a public officer. I'd like to hear from State and then your attorney prior to sentencing.

MS. BOTELHO: Your Honor, in terms of sentencing I would ask that the Defendant enter and



complete an impulse control class. I would ask that the Court lobby a $500 fine or the equivalent in community service. I would ask that the Defendant be ordered to stay out of trouble for the pendency of the case. I would ask for a 90-day suspended sentence. That's as to each count to run concurrent. That's our request.

THE COURT: Defense?

MR. MEE: Your Honor, I'm asking the Court to sentence the Defendant to credit for time served for these offenses. Even if the Court concludes and the Court did conclude that he didn't have the right to do what he did, I think the Court can see that he sincerely believes that he had the right to do so. That's based on his past experiences and the training he received in reference to the First Amendment. I don't think there's any intent from the Defendant to engage in any wrongdoing in this case, Your Honor. That being the case especially because of the public policy interest at issue --

THE COURT: When you say he doesn't wish to engage in any wrongdoing, it seems to me from observing him in the video he wants -- he wants this. He wants to get arrested. He wants to get into an altercation with the police officers. He welcomes this. This helps his You Tube channel. He called the officers here in my



courtroom today pigs. He called -- and he's nodding his head up and down.

THE DEFENDANT: I agree.

THE COURT: So apparently he hates every law enforcement officer in the United States. Please stand up, sir. Are you finished?

MR. MEE: I would emphasize, Your Honor, that the Defendant testified and he sincerely believes he is providing a public service when he reviews and films these incidents. I understand the Court might have a different view of that but when we're talking First Amendment public policy issues such as supervising people involved in government, I think that is something the Court can take into consideration. I will submit.

THE COURT: All right. Mr. Decastro, please stand. I hereby sentence you to 90 days in the Clark County Detention Center on Count 1. 90 days in the Clark County Detention Center on Count 2 to run consecutive for a total of 180 days in custody. Thank you.

THE DEFENDANT: Sentence suspended or --

THE COURT: Oh, no. It's going to start right now.

/ / /

/ / /



* * * * *

ATTEST: FULL, TRUE AND ACCURATE TRANSCRIPT OF PROCEEDINGS.

\s\Christa Broka

CHRISTA D. BROKA, CCR 574

IN THE JUSTICE COURT OF LAS VEGAS TOWNSHIP
COUNTY OF CLARK, STATE OF NEVADA
-o0o-

STATE OF NEVADA, )
Plaintiff, )
vs. ) Case No. 23CR013015
JOSE DECASTRO, ) ATTEST RE: NRS 239B.030
Defendant, )
_______________)

STATE OF NEVADA)
) ss
COUNTY OF CLARK)

I, Christa D. Broka, a Certified Shorthand Reporter within and for the county of Clark and the State of Nevada, do hereby certify:

That REPORTER'S TRANSCRIPT OF PROCEEDINGS was reported in open court pursuant to NRS 3.360 regarding the above proceedings in Las Vegas Justice Court 8, 2024, Lewis Avenue, Las Vegas, Nevada.

That said TRANSCRIPT:

_X_ Does not contain the Social Security number of any person.

__ Contains the Social Security number of a person.



ATTEST: I further certify that I am not interested in the events of this action.

\s\Christa Broka
CHRISTA D. BROKA, CCR 574

CASE NO. **C-24-381730-A**

IN THE JUSTICE COURT OF LAS VEGAS TOWNSHIP
COUNTY OF CLARK, STATE OF NEVADA

THE STATE OF NEVADA, )
Plaintiff, )
vs. ) CASE NO. **23CR013015**
JOSE DECASTRO, )
Defendant. )
_______________________)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ANN E. ZIMMERMAN
JUSTICE OF THE PEACE
MONDAY, APRIL 1, 2024
8:00 A.M.

APPEARANCES:

For the State: A. BOTELHO, ESQ.
DEPUTY DISTRICT ATTORNEY

For the Defendant: C. ORAM, ESQ.
ATTORNEY AT LAW

Reported by: CHRISTA BROKA, CCR. No. 574



LAS VEGAS, CLARK COUNTY, NEVADA,
APRIL 1, 2024 AT 8:00 A.M.
P R O C E E D I N G S

THE COURT: Jose Decastro, 23CR013015. Good morning.

MR. ORAM: Good morning, Your Honor. Christopher Oram on behalf of Mr. DeCastro. He is present in custody.

THE COURT: Nice to see you, Chris.

MS. BOTELHO: Agnes Botelho for the State bar number 11064.

THE COURT: This is your motion.

MR. ORAM: Yes, Your Honor. First of all, I've had a chance to watch the video of the trial. I watched Mr. Decastro come into your courtroom in an extraordinarily disrespectful fashion and refer to the marshall in an inappropriate way. I then saw some other things that I would consider very poor courtroom antics. Mr. Decastro was convicted. He was given six months in jail. One thing I know that he wanted to do today is for no other purpose no matter what your ruling he wants to say sorry. I've asked him if he'd say sorry to the Court. I understand that you may see it as that he should apologize to the marshall. I don't see the



Electronically Filed
4/22/2024 3:01 PM
Steven D. Grierson
CLERK OF THE COURT

marshall he did this to here. The issues that I saw seem to be significant Constitutional issues. The Court addressed it but what I did notice is this should have really been briefed beforehand on First Amendment issues so the Court could have had that, that's no fault, but I think it should have been done beforehand. I also noticed at the time of sentencing the State asked for a suspended sentence but Mr. Decastro just pushed it, pushed it, pushed it, and I see that reasonably agitated and irritated the Court causing a sentence that is now six months. This man from what I can tell, Your Honor, has no prior felony convictions whatsoever. I'm doing that upon information and belief. I haven't run his scope. I know the State can do that but I don't see that he has any felony convictions. He's made his appearances. I think the time in jail has been shocking to him. I know it has because I can tell the reaction of the calls everyday and how difficult it is for him. I think he pushed this and has -- is learning a very very difficult lesson in life. I would ask the Court to consider based on his ties to the community with a sister here, nephew, he has a whole bunch of people that wanted to come to court which I suggested if they come here be respectful and mindful of what's already occurred in this court. But what I'd ask the Court to



do given his lack of any serious criminal history, his remorse for his behavior in this courtroom during the trial, and the fact that the State at the time did not want jail time, I'd ask for an appeal bond, Your Honor. So the issue can be -- these issues can be properly raised. And so with that, Your Honor, I'd ask for an O.R. I would just say a reasonable bail. I would suggest that since he came to the trial and he has since gotten a taste of what inappropriate behavior in a courtroom looks like and feels like, I would ask for a bail in the amount of 10 or $20,000 -- an appeal bond in the amount 10 or $20,000. With that, Your Honor, I would submit.

THE COURT: State?

MS. BOTELHO: Your Honor, may I respond orally? Typically pursuant to the Nevada Rules of Criminal Practice the State has ten days to file an opposition but this was placed on calendar very quickly. So I would ask for leave of the the Court to answer orally.

THE COURT: Okay.

MS. BOTELHO: Your Honor, I am in receipt of Mr. Oram's motion for bail or in the alternative for his own recognizance release. I would note that NRS 178.488 does make it discretionary upon this Court whether you

5

would allow bail pending appeal. Mr. Decastro there has been a briefing schedule set before Judge Leavitt in District Court on the appeal but it's not set to be heard until July. It's discretionary, Your Honor. The State would oppose this Court setting a bail at this point. There seems to be this assumption that this Court sentenced Mr. Decastro to six months in the Clark County Detention Center just because of his conduct or his inappropriate conduct in court. I would venture to say that Your Honor presided over the trial to where you found guilt beyond a reasonable doubt for both the obstructing a police officer and resisting a police officer. You saw his conduct in the body worn camera by the officer and I would venture to say and I would submit to the Court that the six-month sentence that you imposed isn't simply for his behavior in court or his behavior to your marshall but that is an appropriate sentence placed on upon the Defendant by the Court due to the charges and the evidence that you saw during trial. There's also been this claim that Mr. Decastro has stayed trouble free for most of his life. I would venture to say, yes, he does not have felony convictions. He does not have gross misdemeanor convictions. But he does have pretty consistent contact with law enforcement. He does have a warrant out of

6

Ohio a trespass and I understand that's a piddley misdemeanor, however, it is in warrant status. He has a pending case in Las Vegas Justice Court for the very same offenses that this Court heard during the trial here. As to the claim that, you know, hey, there were issues before trial and there were First Amendment issues raised and briefed prior to, Your Honor Defense Counsel was able to argue the First Amendment defense. Your Honor, heard these arguments both during the trial and during closing arguments. Mr. Decastro when he took the stand raised them as a defense. But Your Honor held after listening to all of the evidence and applying the law, Your Honor held -- found him guilty regardless. This was not a First Amendment issue. The State stands by that. This was simply the Defendant breaking the law and he was sentenced accordingly for his behavior. It was conduct -- it was a consequence an appropriate sentence imposed by the Court to the Defendant. We would oppose any kind of change or bail setting or O.R. at this point. This is not a pretrial detention. This is not pretrial -- Valdez-Jiminez was cited also in the Defense Counsel's motion. Valdez-Jiminez is about pretrial detention. Mr. Decastro is no longer cloaked with the presumption of innocence. He has been found guilty beyond a reasonable doubt by Your Honor. At this

7

point I would ask that the six-month sentence that you imposed stand and he remain in custody.

MR. ORAM: May I reply?

THE COURT: I'm going to ask the interpreter to quit reading. Thank you.

MR. ORAM: Your Honor, the statute we cited is in fact just discretionary to you to determine pending appeal whether an appeal bond can be issued. I hear the State. I recognize you found him guilty. I am not trying to in anyway argue that. On appeal there are legitimate issues. The Court can see there are some First Amendment issues just from watching the video things that a Court can consider on appeal so that's the only basis I'm bringing that up on. But given the fact that I think he really is contrite for what he's done --

THE COURT: I disagree. Have you watched the videos that have been posted since he has been incarcerated?

MR. ORAM: I am in a murder trial, Your Honor.

THE COURT: I guess he can apologize to me in a minute but that's not what he's saying on -- what he's publishing online and in his phone calls from the jail. That's not what he's saying at all. Are you aware that he has a trial pending in Las Vegas Municipal

8

Court, he has a case pending in Good Springs Justice Court where he continues to manufacture situations where he will get arrested?

MR. ORAM: Your Honor, I represent that's what he was sort of doing for a living. He's now been incarcerated --

THE COURT: What he is saying in the couple of weeks since he's been incarcerated when he calls from the jail and publishes them on his website is not what he's about to say to me. Okay? So he's going to apologize to me now but that's not what he's doing publicly. Okay?

MR. ORAM: Okay. I won't have him speak at this time. But I would still ask you to consider that there may be legitimate issues, I think there are, for Judge Leavitt to consider. I think these are sort of issues of first impression that was the other thing I saw is in the State of Nevada I can't find any case law that specifically talks about this filming of police officers. What I would say to the Court is I recognize it's obnoxious behavior is what it appears to be. Whether it's protected is another thing that I think higher courts need to look at. I can see if the Court has already made up its mind --

THE COURT: I want to be clear that I did

not have a problem with him filming and I said that when I sentenced him. That was not the issue. It was the safety issues that he created with his behavior. I also did not sentence him because of his ridiculous behavior in court. That wasn't why I sentenced him to jail. I sentenced him because I found him guilty beyond a reasonable doubt and I thought that was the appropriate sentence. I could have given him 180 days on each count and ran it consecutive for a year in jail but I didn't. His behavior was unacceptable in court but that's not what I sentenced him for. I did not sentence him for his behavior in court. I sentenced him for his behavior for the two charges that he faced.

MR. ORAM: Yes, Your Honor.

THE COURT: All right. So your motion is denied. Thank you.

* * * * *

ATTEST: FULL, TRUE AND ACCURATE TRANSCRIPT OF PROCEEDINGS.

\s\Christa Broka

CHRISTA D. BROKA, CCR 574



IN THE JUSTICE COURT OF LAS VEGAS TOWNSHIP
COUNTY OF CLARK, STATE OF NEVADA
-o0o-

STATE OF NEVADA, )
Plaintiff, )
vs. ) Case No. 23CR013015
JOSE DECASTRO, ) ATTEST RE: NRS 239B.030
Defendant, )
_______________)

STATE OF NEVADA)
) ss
COUNTY OF CLARK)

I, Christa D. Broka, a Certified Shorthand Reporter within and for the county of Clark and the State of Nevada, do hereby certify:

That REPORTER'S TRANSCRIPT OF PROCEEDINGS was reported in open court pursuant to NRS 3.360 regarding the above proceedings in Las Vegas Justice Court 8, 2024, Lewis Avenue, Las Vegas, Nevada.

That said TRANSCRIPT:

_X_ Does not contain the Social Security number of any person.

__ Contains the Social Security number of a person.



ATTEST: I further certify that I am not interested in the events of this action.

\s\Christa Broka

CHRISTA D. BROKA, CCR 574

**C-24-381730-A**

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**

**Criminal Appeal** | **COURT MINUTES** | **April 09, 2024**

C-24-381730-A Jose Decastro, Appellant(s)
vs
State of Nevada, Respondent(s)

**Department 12**

**April 09, 2024** **12:29 PM** **Minute Order**

**HEARD BY:** Leavitt, Michelle **COURTROOM:** Chambers

**COURT CLERK:** Villatoro, Reina

**RECORDER:**

**REPORTER:**

**PARTIES PRESENT:**

## JOURNAL ENTRIES

The court having reviewed the Motion for Bail or in the Alternative for Own Recognizance Release, does hereby deny Apellants request for bail. The hearing scheduled for April 10, 2024 is vacated.

Electronically Filed
07/19/2024 3:23 PM
CLERK OF THE COURT

**ORDG**

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**

JOSE DECASTRO,
Appellant,
vs.
STATE OF NEVADA,
Respondent.

CASE NO.: C-24-381730-A
23-CR-013015

Dept: XII

**ORDER GRANTING APPEAL**

**DECISION**

This is an appeal from a judgment of conviction, pursuant to a bench trial of two misdemeanor violations, one (1) count of Obstructing a Public Officer NRS 197.190 and one (1) count of Resisting a Public Officer NRS 199.280.3. (Las Vegas Township Justice Court, Clark County; Ann E. Zimmerman, Judge).

Appellant Jose DeCastro was charged with two (2) misdemeanor violation counts relating to obstructing and resisting a public officer regarding the filming of a traffic stop that occurred in a commercial parking lot. Mr. DeCastro was sentenced to one hundred and eighty (180) days in the Clark County Detention Center. Mr. DeCastro asserts four (4) claims on appeal. The Court having heard the matter on July 10th, 2024, rules as follows.

**I. Relevant Facts and Procedural History**

On March 15, 2023, Ofc. Branden Bourque conducted a vehicle stop on a Hyundai in a parking lot at 4155 S, Grand Canyon Drive, Las Vegas, Nevada. During the vehicle stop, Mr. DeCastro began filming the police encounter. Ofc. Bourque testified that he instructed Mr. DeCastro to back up. Mr. DeCastro testified that he did back up. At trial, Ofc. Bourque referenced a “twenty-one foot” rule. The Court found that Ofc. Bourque did not vocalize that


Statistically closed: D. _USJR - CR - Transferred (before/during trial) (USCT)

Mr. DeCastro should back up to twenty-one feet away from the Officer. Ofc. Bourque detained Mr. DeCastro and cited him for Obstructing a Public Officer and Resisting Arrest.

**II. Applicable Law**

The First Amendment provides: "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peacefully to assemble, and to petition the Government for a redress of grievances".

The constitutional right to film public officials has been firmly established by the federal courts. In Glik v. Cunniffe, the court summarized the issue as, "although not unqualified, a citizen's right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment. Glik v. Cunniffe, 655 F.3d 78, 79 (1st Cir. 2011). "In line with these principles, we have previously recognized that the videotaping of public officials is an exercise of First Amendment liberties." Id at 83.

On February 22, 2024, the Nevada Court of Appeals carefully examined NRS 197.190. Wilson v. First Judicial Dist. Court, 140 Nev. Adv. Op.7 (Nev. App. 2024).

In Wilson, the Court of Appeals reasoned:

> As construed by this court, NRS 197.190 prohibits only physical conduct and fighting words that hinder, delay, or obstruct a public officer in the discharge of official duties or powers. As such, law enforcement has no discretion to arrest persons for protected speech or for physical conduct that is merely annoying or offensive.

Id at 23.

The Court of Appeals determined that specific intent to hinder, delay or obstruct is a requirement of the statute. Id. The Court of Appeals further held "therefore, we interpret NRS 197.190 as applying only to physical conduct and fighting words". Id at 18. The Court of

Appeals further explained that "blocking the path of an officer" may amount to obstruction. Id. The court also cited Washington v. Hudson, 784 P.2d533, 537 (Wash. Ct. App. 1990) where non-aggressive behavior may cause obstruction.

In Wilson, the court determined that the real issue was whether there was sufficient evidence to convict Wilson of the obstruction charge and whether the district court had properly considered the issue on appeal. Wilson v. First Judicial Dist. Court, 140 Nev. Adv. Op.7 (Nev. App. 2024). The Court explained:

> The district court did not have the benefit of our interpretation of NRS 197.190 as being limited to physical conduct and fighting words, and it therefore did not consider whether there was sufficient evidence that Wilson engaged in physical conduct, or uttered fighting words so as to support her conviction of violating NRS 197.190.

Id at 25.

### III. Analysis

This Court is tasked with deciding whether the District Court erred when it convicted Mr. DeCastro of obstructing and resisting a public officer when he was recording a police interaction during a traffic stop.

This Court recognizes that State and Federal law permits the filming of police activities. NRS 171.1233(2)(a) specifically allows for filming of police activities, stating a "peace officer shall not act to interfere with a person's recording of a law enforcement activity, including, without limitation, by: (a) Intentionally preventing or attempting to prevent the person from recording a law enforcement activity."

The right to film police activities is further supported by the precedent set in Glik, which establishes that individuals are permitted to film police activities. Glik v. Cunniffe, 655 F. 3rd 78 (2011). This precedent was relied upon by both the prosecution and defense on appeal.

Additionally, Houchins v. KQED, Inc. establishes that there is a right to gather news from any source by means within the law. Houchins v. KQED, Inc., 438 U.S. 1, 11, 98 S. Ct.

2588, 57L. Ed. 2d 553 (1978) (quoting Branzburg v. Hayes, 408 U.S. 665, 681-82, 92 S. Ct. 2646 (1972)). Mills v. Alabama established that there is a right to film government officials engaged in their duties in a public place, including police officers performing their responsibilities and serves as a cardinal First Amendment interest in protecting and promoting "the free discussion of governmental affairs." Mills v. Alabama, 384 U.S. 214, 218, 86 S. Ct.1434, 16 L. Ed. 2d 484 (1966). The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest. Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000). *See also* Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a "First Amendment right to film matters of public interest").

This Court carefully considered the decision in Wilson. The Trial Court did not consider the Wilson decision[1]. The Wilson decision establishes fighting words, physical conduct, obstructing the pathway, or fleeing an officer as standards that apply to obstruction. Wilson v. First Judicial Dist. Court, 140 Nev. Adv. Op. 7 (Nev. App. 2024). This Court found that none of the criteria for obstruction, as defined in Wilson, were met in the present case.

Furthermore, this Court reviews the Wilson Court decision that determined specific intent to hinder, delay or obstruct is a requirement of NRS. 171.1233(2)(a). Id. The Nevada Court of Appeals held, "therefore, we interpret NRS 197.190 as applying only to physical conduct and fighting words" Id at 18.

This Court found that after being ordered to cease speaking to the driver by Ofc. Bourque Mr. DeCastro complied, and on direct appeal the State agreed with that assessment.

---

[1] This Court acknowledges that the Wilson decision was rendered less than a month before Mr. DeCastro's trial. Additionally, the Defense failed to file a pre-trial motion litigating this issue and citing the Wilson decision.

This Court takes notice that, at trial, Officer Bourque claimed Mr. DeCastro did not back up. However, this Court concluded that Mr. DeCastro did in fact back up when ordered to do so. This Court recognized that there is no “twenty-one foot” rule regarding the distance officers can be filmed while performing police activities.

This Court found that Mr. DeCastro utilized provocative and challenging language that could be described as offensive and annoying but, ultimately, the behavior was protected by the First Amendment to the U.S. Constitution. City of Houston v. Hill, 482 U.S. 451,461, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). Glik v. Cunniffe, 655 F. 3rd 78 (2011). Wilson v. First Judicial Dist. Court, 140 Nev. Adv. Op. 7 (Nev. App. 2024).

The State attempted to argue time, place, and manner restrictions on First Amendment activities supported Mr. DeCastro’s convictions. This Court observed that the interaction between Mr. DeCastro and Ofc. Bourque transpired in a sizable parking lot, in the course of a traffic stop, during daylight hours. This Court recognized that the driver of the vehicle had no right to privacy in that setting. Furthermore, this Court found that Ofc. Bourque was not hindered in his ability to issue the driver a citation. Ofc. Bourque chose to let the driver go in order to concentrate his attention on Mr. DeCastro while Mr. DeCastro was practicing his constitutionally protected right to film.

This Court finds that Mr. DeCastro did not Obstruct Ofc. Bourque nor did Mr. DeCastro resist arrest. This Court grants the appeal and reverses the convictions based upon First Amendment Protected Conduct.

///

///

///

///

**IV. Conclusion**

Having reviewed the record and considered the issues raised on appeal, this Court concludes that reversal is warranted. The Court therefore grants Mr. DeCastro his appeal and reverses the convictions of Count One (1) and Count Two (2).

Dated this ___ day of _________, 20___.

**Dated this 19th day of July, 2024**

MICHELLE LEAVITT
DISTRICT COURT JUDGE

**41E B85 6F03 2C41**
**Michelle Leavitt**
**District Court Judge**

Electronically Filed
03/28/2024 3:23 PM
CLERK OF THE COURT

ORDR

DISTRICT COURT

CLARK COUNTY, NEVADA

JOSE DECASTRO,

Appellant,

vs.

STATE OF NEVADA,

Respondent.

Case No.: C-24-381730-A

DEPT. No.: XII

**ORDER SETTING HEARING IN DISTRICT COURT XII ON CRIMINAL APPEAL FROM LAS VEGAS JUSTICE COURT**

IT IS HEREBY ORDERED THAT:

A. The above-entitled Criminal Appeal from Las Vegas Justice Court has been set for hearing on **Wednesday, July 10, 2024, at 9:00 a.m.** in Department XII of the District Court.

B. Within Ten (10) days after filing of the Notice of Appeal, the transcript should have been ordered for inclusion in the record on appeal unless a greater amount of time has been allowed. The transcript shall be ordered by the Appellant.

C. The parties are hereby ordered to submit appellate briefs as follows:

1. Appellant's Opening Brief shall be filed by **May 6, 2024** with the District Court Clerk and served on Respondent.
2. The Respondent shall serve an Answering Brief by June 5, 2024.
3. After service of Respondent's Brief, any Reply Brief must be served and filed by June 19, 2024.

E. Original Briefs shall be filed with the District Court Clerk. Courtesy copies of

briefs shall be submitted to Department XII of the Eighth Judicial District Court at dept12lc@clarkcountycourts.us.

F. Failure to comply with this Order shall result in the dismissal of the appeal or any other remedy deemed appropriate by the Court.

Dated this 28th day of March, 2024

**CDA 505 B40D 8341**
**Michelle Leavitt**
**District Court Judge**

\po

Electronically Filed
4/4/2024 1:46 PM
Steven D. Grierson
CLERK OF THE COURT

MOT

CHRISTOPHER R. ORAM, ESQ.
Nevada Bar No. 4349
520 S. Fourth Street, Second Floor
Las Vegas, Nevada 89101
Telephone: (702) 384-5563
contact@christopheroramlaw.com
*Attorney for Jose DeCastro*

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**

JOSE DECASTRO,
Defendant,
vs.
STATE OF NEVADA,
Plaintiff.

CASE NO.: C-24-381730-A
DEPT: XII

**HEARING REQUESTED**

**MOTION FOR BAIL, OR IN THE ALTERNATIVE,**
**FOR OWN RECOGNIZANCE RELEASE**

COMES NOW the Defendant, Jose DeCastro, by and through his attorney of record on appeal, CHRISTOPHER R. ORAM, ESQ., and hereby moves this Honorable Court to set a reasonable bail or in the alternative release Defendant on his own recognizance.

This Motion is made and based on the papers and pleadings on file herein, the attached Memorandum and Points and Authorities in support hereof, the Declaration of Christopher R. Oram, Esq., and any oral argument that may be entertained by this Court at the time set for hearing in this Motion.

Dated this 4th day of April 2024.

*/s/ Christopher R. Oram*

Christopher R. Oram, Esq.
Nevada Bar No. 4349
520 S. Fourth Street, Second Floor
Las Vegas, NV 89101
*Attorney for Jose DeCastro*

Electronically Filed
4/4/2024 4:36 PM
Steven D. Grierson
CLERK OF THE COURT

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**
****

| | |
|---|---|
| Jose Decastro, Appellant(s)<br>vs<br>State of Nevada, Respondent(s) | Case No.: C-24-381730-A<br><br>Department 12 |

**NOTICE OF HEARING**

Please be advised that the Defendant's Motion for Bail, or in the Alternative, for Own Recognizance Release in the above-entitled matter is set for hearing as follows:

**Date:** April 10, 2024

**Time:** 9:00 AM

**Location:** RJC Courtroom 14D
Regional Justice Center
200 Lewis Ave.
Las Vegas, NV 89101

**NOTE: Under NEFCR 9(d), if a party is not receiving electronic service through the Eighth Judicial District Court Electronic Filing System, the movant requesting a hearing must serve this notice on the party by traditional means.**

STEVEN D. GRIERSON, CEO/Clerk of the Court

By: /s/ Marie Kramer
Deputy Clerk of the Court

**CERTIFICATE OF SERVICE**

I hereby certify that pursuant to Rule 9(b) of the Nevada Electronic Filing and Conversion Rules a copy of this Notice of Hearing was electronically served to all registered users on this case in the Eighth Judicial District Court Electronic Filing System.

By: /s/ Marie Kramer
Deputy Clerk of the Court